**Brett KASHMARK, Respondent,**

v.

**WESTERN INSURANCE COMPANIES, Appellant,**

v.

**PROGRESSIVE CASUALTY INSURANCE CO., Respondent.**

No. C0–82–925.

Supreme Court of Minnesota.

March 9, 1984.

Arvesen, Donoho, Lundeen, Hoff, Svingen & Athens, for respondent Progressive Cas. Ins. Co.

COYNE, Justice.

Respondent Brett Kashmark brought this declaratory judgment action seeking a judicial determination that he was entitled to uninsured motorist coverage under an insurance policy issued by Western Insurance Companies (Western). Western instituted third-party proceedings against Progressive Casualty Insurance Company (Progressive). The trial court found coverage under the Progressive policy and, by operation of law, under the Western policy and determined that both policies were equally close to the risk. Western appeals from the judgment, and Progressive seeks review of the judgment only insofar as it is based on a finding that an all-terrain cycle qualifies as an uninsured motor vehicle.[1] We affirm in part and reverse in part and remand.

On May 22, 1981, Brett was injured while a passenger on an unregistered three-wheeled all-terrain cycle (ATC) owned by Rydell Schlimme and driven by William Tripp, neither of whom were insured. The accident occurred on a city street in Clinton, Minnesota. Since there was no insurance on the ATC involved in the accident, Brett looked to Western and Progressive for uninsured motorist benefits.

At the time of the accident Brett owned a Kawasaki motorcycle, the described vehicle covered by a Progressive policy issued to Brett Kashmark as the named insured. The Progressive policy provides uninsured motorist coverage with limits of $25,000.

Eugene Kashmark, Brett's father, is the insured named in a Western policy, which affords uninsured motorist coverage with

---

Rufer, Hefte, Pemberton, Schulze, Sorlie, Sefkow & Kershner, Fergus Falls, for appellant.

Richard S. Roberts, Wheaton, for respondent Kashmark.

1. The district court file does not disclose that Kashmark and Progressive are adverse parties. Since, however, Progressive does not complain of an absence of adversity and has expressly limited its notice of review to the propriety of the determination that the ATC was an uninsured motor vehicle, we have no occasion to examine the validity of the judgment that the Progressive policy affords uninsured motorist coverage to Kashmark with respect to the injuries he sustained on May 22, 1981.

**846**

limits of $50,000. Two automobiles are described as insured under the Western policy: a Mercury registered in Eugene's name and a 1973 Camaro which was registered in the names of both Eugene, the father, and Brett, the son, as co-owners. At the time of the accident Brett did not reside in his father's household.

When both insurers denied coverage, Brett instituted this declaratory action. Both insurers claimed that the ATC was not a "motor vehicle" within the definition set out at Minn.Stat. § 65B.49, subd. 4(3) (1982). In addition, Western contended that, since he had moved out of his father's household, Brett was not an insured under the Western uninsured motorist coverage while he was occupying a non-owned vehicle. Progressive admitted the applicability of its uninsured motorist coverage if the ATC were held to be a "motor vehicle" under the No-Fault Act but contended that any coverage it afforded was secondary to that of Western. Western, however, asserted that if its uninsured motorist coverage were applicable to Brett's claim, both policies were equally close to the risk and liability should be pro-rated between them.

The trial court found that the ATC was a motor vehicle as defined in § 65B.49, subd. 4(3) and that it was uninsured. The trial court also found (a) that Brett was insured under the Western policy as a "person using" the covered automobile, (b) that Western knew, should have known, or negligently failed to determine whether Brett was the owner of the Camaro, and (c) that Minn.Stat. § 65B.49, subd. 4(1) and (2) mandated that uninsured motorist coverage be extended to Brett while occupying a non-owned motor vehicle.

■ We address first the question of the accuracy of the trial court's determination that the ATC was an uninsured motor vehicle. Although we do not necessarily disagree with the trial court's finding that the ATC is an "uninsured motor vehicle" as that term is defined in § 65B.49, subd. 4(3), resort to the statutory definition is unnecessary. For purposes of the uninsured motorist coverage both the Western and Pro-

gressive policies define an uninsured motor vehicle as a land motor vehicle of any type to which no bodily injury liability policy applies at the time of the accident except "equipment designed mainly for use off public roads while not on public roads." Although an all-terrain cycle may be said to have been designed principally for use off public roads, the accident in which Brett Kashmark was injured occurred while the ATC was on a public road.

We hold, therefore, that the Schlimme ATC is an uninsured motor vehicle for purposes of the uninsured motorist coverage afforded under both the Western and Progressive policies.

We disagree, however, with the trial court's conclusion that Minn.Stat. § 65B.49, subd. 4 (1982), mandates the extension of the uninsured motorist provisions of the Western policy to afford coverage for the injuries Brett Kashmark sustained while riding the ATC.

For many years Eugene Kashmark, Brett's father, had secured insurance on his business and personal vehicles through Sherman Insurance Agency. When Brett was 16 years old Eugene directed the Sherman Agency to add a 1968 Plymouth Fury to the Western policy insuring his personal automobiles. Apparently, Eugene advised the agent that 16-year-old Brett was the principal driver of the Plymouth, for the premium charged reflected the principal driver's youth. Since, however, Brett was not yet 17 years old, he could not lawfully own an automobile, Minn.Stat. § 168.101 (1982), so it may be assumed that Eugene was the owner and that he so advised the agent—even though he may also have referred to the Plymouth as "Brett's car."

In May of 1979, when Brett was still a high school student living in his parents' home, Eugene informed the Sherman Agency that Brett had traded cars and that he wanted the insurance transferred from the Plymouth to the Camaro. Eugene testified that he told the agent that the car was Brett's, that Brett had traded cars, and that Eugene wanted the insurance transferred from the one vehicle to the

other. Eugene also testified that the Camaro was not in his (Eugene's) name; he was mistaken, for he was registered as co-owner. Eugene knew that the policy insuring the Plymouth listed Eugene Kashmark alone as the named insured, yet he admitted that he did not tell the agent either that the Camaro was registered in Brett's name or in Eugene's and Brett's names as co-owners. Instead, when he advised the Sherman Agency that the Camaro had been acquired, he "left it on the same policy."

About a year later, Brett Kashmark moved from his parental home into a trailer house of his own. Neither Brett nor Eugene advised the Sherman Agency of the move.

▆▆▆▆ Under the terms of the uninsured motorist coverage of the Western policy, Brett Kashmark was not an insured or "covered person" because he was not the named insured nor a member of the named insured's family residing in the named insured's household. Neither was he occupying either of the automobiles described in the Western policy. Nevertheless, the trial court extended coverage to Brett by operation of law. Although Brett did not expressly seek reformation and although the trial court did not characterize its action as reformation, the effect of its determination was to reform the policy to make Brett an additional named insured. Reformation could be grounded on the actual knowledge of the Sherman Agency that Brett was the owner or co-owner of the Camaro—i.e., on the fact that Eugene Kashmark so informed Western's agent. The record, if it could be said to permit such an inference, certainly does not disclose that clear, precise and convincing evidence which is required for reformation. *Tollefson v. American Family Ins. Co.*, 302 Minn. 1, 226 N.W.2d 280 (1974). Nevertheless, because it seems to us that the question is one of fact, had the trial court found as fact that Eugene informed the agent of the identity of the owner, we should be reluc-

tant to substitute our judgment for that of the fact finder. But the trial court did *not* find that Eugene had informed the agent. The trial court made its finding in the alternative:

> That defendant Western Insurance Company either knew, should have known or negligently failed to determine whether Brett Kashmark was the owner of the 1973 Chevrolet two-door Camaro.

Although actual knowledge may provide a basis for reformation,[2] to say that Western "should have known or negligently failed to determine" is to impose on Western an ongoing duty which this court has declared to be non-existent. *Tollefson v. American Family Ins. Co.*, 302 Minn. 1, 226 N.W.2d 280 (1974). By endorsement to her father's automobile liability insurance policy, 17-year-old Patricia Tollefson was named as an additional insured. Patricia paid the additional premium attributable to the endorsement and continued to make the premium payment three years later, after she had moved to Minneapolis from her parents' home in Brainerd. Her remittance checks showed her Minneapolis address. We held that an insurance company has no obligation to ferret out at regular intervals information which brings policyholders within the exclusions of a policy and that the insurer's agent had no duty to determine whether or not Patricia continued to be a member of her father's household. Pointing out that it is unrealistic to impose on an insurance agent who services hundreds of policies an ongoing duty of surveillance, we recognized in *Tollefson* that a duty to advise of a change of status rested on the insured:

> Policyholders are constantly changing their personal situations in ways which increase or decrease their liability carriers' exposure. *Changes in address and ownership of automobiles* and the members of the immediate family eligible to drive and the number of vehicles operated, the occupation of the insured and his family, and the value of the property

---

**2.** That the finding is in the alternative itself suggests the lack of clear and convincing evi-

dence that Western had actual knowledge that Brett owned the Camaro.

insured are but a few examples of constantly changing conditions which the insured is in a far better position to communicate to the insurer than the insurer is to determine on its own initiative.

*Id.* at 7, 226 N.W.2d at 284 (1974) (emphasis added).

■ In the light of our conclusion in *Tollefson* that delivery of Patricia's check, bearing a Minneapolis address, was not enough to trigger a duty to inquire whether or not she resided in her parents' household in Brainerd, it is difficult to understand how Eugene's advice that "the kid traded cars" or a casual reference to "Brett's car" can be said to have alerted the agent to a change of ownership or created a duty to inquire whether or not there had been a change of ownership as well as a change of automobiles. A man who mentions "my wife's car" or "my son's car" is as likely to be referring to an automobile which he owns and furnishes for the regular use of his wife or son, as to a car which his wife or son actually owns.

When the Western policy was issued, Eugene, the named insured, owned the Plymouth Fury which was one of the vehicles insured under the policy. According to the terms of the policy, it also insures any other automobiles of which the named insured or the named insured's spouse acquire ownership during the policy period, provided the insured notifies the insurer. Hence, when Eugene notified the agent that the Camaro should be substituted for the Plymouth and when Eugene, in his words, "left it on the same policy," there was at least a tacit representation that Eugene owned the Camaro just as he had owned the car which the Camaro replaced. Certainly, the duty with respect to ownership of the newly acquired vehicle was the duty resting on Eugene to advise of the changed ownership, not a duty resting on the agent to inquire. To shift that burden in the context of this transaction would require us to overrule *Tollefson.*

■ Moreover, with respect to the accident of May 22, 1981, there is no basis upon which Brett Kashmark can qualify as an insured under the uninsured motorist coverage of the Western policy unless the policy is reformed. The onerous burden of proof necessary to permit reformation may not be avoided by imputing coverage by operation of law. *Kaysen v. Federal Ins. Co.,* 268 N.W.2d 920 (Minn.1978), on which the trial court relied, does not support the imputation of coverage under the circumstances of this case. Mars Industries, Inc. was the named insured in the policy of automobile insurance construed in *Kaysen.* David Distel, a vice president and director of Mars Industries, and his wife were killed by a hit-and-run driver while they were walking in the roadway. Mr. Distel was denominated as an insured under the comprehensive liability coverage of the Mars Industries policy. Distel was not identified as an insured by name but rather by virtue of his position as an officer and director, for "insured" was defined there as including the named insured, Mars Industries, and also its executive officers. By its terms the policy insured executive officers not only when they were using a motor vehicle described in the policy declarations but also while they were using a hired vehicle and even while they were using any other automobile in connection with Mars Industries' business. Since Mr. Distel was a "person insured" under the liability portion of the policy, it was held that the uninsured motorist coverage for "persons insured thereunder" required by Minn.Stat. § 65B.49, subd. 4(1) (1982), should be inserted by operation of law. *Id.* at 925.

At the same time, however, we held that Mrs. Distel, who was killed by the same hit-and-run driver but who was not a person insured under any section of the Mars Industries policy, was *not* an insured under the uninsured motorist coverage. There was no basis for the imputation of coverage by operation of law.

Although Brett Kashmark is identified in the Request for Automobile Change as the principal operator of the Camaro, nothing in the liability portion of Eugene Kashmark's policy identifies a "principal opera-

tor" of a covered auto as an insured.[3] As long as Brett was a resident of his father's household, he was a "family member"—as that term is defined in the policy—and, hence, was insured against liability arising out of the use of *any* automobile.[4] Once Brett left the parental home and established his own household, however, he—like Mrs. Distel—had no insured status under Eugene's policy except that which he—and Mrs. Distel—had in common with the rest of the world. Brett was insured against liability (under what is commonly called the "omnibus clause") while he used the Camaro, just as Mrs. Distel was insured against liability while using the Mars Industries-owned Mazda furnished for Mr. Distel's use. Similarly, Brett, like Mrs. Distel, was an insured under the uninsured motorist coverage only when occupying an automobile described in the policy declarations. Like Mrs. Distel, Brett was not insured under the uninsured motorist coverage while occupying any other vehicle or while a pedestrian. And just as there was no basis for imputing coverage for Mrs. Distel by operation of law, there is no basis for imputing coverage for Brett Kashmark.

 In short, it was Brett's change of residence about a year after the acquisition of the Camaro which changed Brett's status under Eugene's policy from a family member insured under both liability and uninsured motorist coverages to an "omnibus" insured entitled to coverage only while using a described auto. It is conceded that the insurer was not informed of Brett's change of residence. Hence, the Western policy does not insure Brett with respect to the injuries he suffered while riding the ATC unless Western had actual knowledge of Brett's ownership of the Camaro which would justify reformation. Accordingly, we reverse and remand for a determination whether or not the policy should be reformed to include Brett Kash-

mark as a named insured with respect to the Camaro.

Reversed and remanded.

---

3. Since the policy declarations are not included in the record, we assume that Brett Kashmark is not there designated as an insured.

4. The Western policy excludes coverage—regardless of status as an insured—for liability arising out of the use of any self-propelled vehi-

cle having less than four wheels. Hence, even if Brett had been the named insured under the Western policy, he would not have been insured against liability arising out of the use of the ATC.