**Jeanette E. DAVIDSON, Respondent,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY OF BLOOMINGTON, ILLINOIS, Appellant.**

No. C1-85-351.

Court of Appeals of Minnesota.

Sept. 3, 1985.

Review Denied Nov. 1, 1985.

Kurt J. Marben, Thief River Falls, for respondent.

Steven L. Marquart, Moorhead, for appellant.

Heard, considered, and decided by PARKER, P.J., and HUSPENI and FORSBERG, JJ.

## OPINION

HUSPENI, Judge.

Appellant State Farm Mutual Automobile Insurance Company (State Farm) appeals from the trial court determination that respondent Jeanette E. Davidson was entitled to uninsured motorist benefits in connection with an automobile accident in which her husband, Dr. Duane Davidson, was killed, and that Mrs. Davidson could stack uninsured motorist benefits and economic loss benefits on six vehicles used by the Davidson family. We affirm.

## FACTS

On December 10, 1983, Dr. Davidson was killed in a head-on collision when the vehicle he was driving collided with a vehicle driven by Brian Holthusen.

Dr. Davidson was one of two medical doctors engaged in practice at the Thief River Falls Clinic (the Clinic) in Thief River Falls, Minnesota. The Clinic was a professional corporation in which Dr. Davidson and his partner, Dr. Leo Herber, each owned fifty percent. Two cars were registered to the Clinic, a 1983 Chevrolet Ce-

lebrity and a 1982 Chrysler. Davidson had the exclusive use of the Celebrity, the vehicle he was driving at the time of the accident. Herber had the exclusive use of the Chrysler. The vehicles were used for professional purposes and also served as family cars for the respective doctors. These vehicles were insured in a fleet policy issued by State Farm to the Clinic. The Clinic paid the insurance premiums for these two vehicles. Herber testified in his deposition that neither car was essential to the Clinic business. When a car was fully depreciated by the Clinic, the Clinic would transfer ownership of the vehicle to the doctor who had been driving it.

In addition to the Celebrity and Chrysler, seven other vehicles were also insured on the Clinic's fleet policy. Relevant information regarding these vehicles is as follows:

1. 1979 Plymouth Horizon: title was in the name of the Clinic but at the time of the accident owned by Davidson as a result of a purchase from the Clinic; garaged at the Davidson home; and insurance premium paid by Davidson through check to the Clinic.

2. 1969 Plymouth stationwagon: owned by Davidson; garaged at his home; and insurance premium paid by Davidson through check to the Clinic.

3. 1959 Chevrolet two-ton truck: owned by Davidson; garaged at his home; and insurance premium paid by Davidson through check to the Clinic.

4. 1980 Renault: purchased by Davidson; title in the name of Davidson's son and daughter-in-law, Clyde and Susan Davidson; garaged in Lincoln, Nebraska where they lived; vehicle also driven by two other Davidson children living in Lincoln; insurance premium paid by Davidson through check to the Clinic.

5. 1981 Oldsmobile Cutlass: owned by Davidson; used by Davidson's son, Dan, since August 1983 while attending school in California; insurance premium paid by Davidson through check to the Clinic.

6. Chevrolet Citation: title was in the name of the Clinic but purchased from the Clinic by Herber; insurance premium paid by Herber through check to the Clinic.

7. 1967 Ford Convertible: owned by Herber's son, George, who was attending school in Michigan; insurance premiums paid by Herber through check to the Clinic.

The fleet policy was first issued to the Clinic in 1974 upon the recommendation of State Farm's agent. The agent testified that the fleet policy provided the convenience of one annual billing, and allowed vehicles to be added or dropped more conveniently than individual policies.

The named insured under the policy has been the Clinic since the policy was first written in 1974. Davidson and the Clinic's business manager signed the insurance application which listed the Clinic as the named insured.

The agent testified that when he wrote the policy he assumed that the members of the Davidson family would have the benefits of a family policy. Herber also stated in his deposition that the fleet policy was intended to give his family and the Davidson family full coverage. Davidson and Herber selected the insurance coverage for the vehicles used by their respective families. The agent further testified that five of the Davidson vehicles on the fleet policy would qualify for a family policy issued by State Farm. In such a family policy, Davidson, at his discretion, would have been the named insured. Since the time the fleet policy was issued, neither Davidson nor Herber discussed with State Farm whether a family policy would provide better coverage.

The premiums charged by State Farm for each vehicle insured under the fleet policy were identical to the premiums charged for vehicles insured under individual policies. Separate premiums were charged for each vehicle and computed based on which family members would be driving each vehicle.

Each of the nine fleet policy vehicles had $50/$100,000 uninsured motorist coverage, $50,000 medical coverage and $10,000 economic loss benefits.

At the time of the accident, Brian Holthusen was driving a Mercury Montego given to him by his stepfather. He was eighteen years old and was living with his grandfather, Reinhard Holthusen.

He owned two vehicles, a 1974 pickup truck and a 1978 Ford Fairmont. These vehicles were insured under two separate automobile policies also issued by State Farm. Each policy carried liability coverage of $50,000. The pickup truck was used on the farm for tasks such as hauling wood. At the time of the accident, the truck had been disabled for several months. Reinhard Holthusen's testimony indicates that the truck "hardly ever went off the place. Well, it went off the place and down the road a mile or so and went in the woods. That's about all." His testimony further indicates that the Fairmont was the family's highway car. Brian Holthusen's testimony indicates, however, that the pickup truck was used occasionally for trips into town.

When Brian received the Montego in early 1982, it lacked a motor, transmission, and wheels. He testified that he wanted to fix up the Montego "so we could get rid of our Fairmont," that the Fairmont was small and inconvenient, and that the Montego was never intended to replace the pickup because "[y]ou can't haul wood with a car."

The Montego was first in operating condition the day before the fatal collision. At the time of the collision, Brian was returning from Thief River Falls where he had gone the previous day to repair the taillights and headlights of the Montego. He testified that he also intended to see the State Farm agent about transferring insurance coverage from the pickup to the Montego. He did not do so, however, and the Montego was not specifically insured at the time of the collision.

After the accident, State Farm originally determined that the Montego was uninsured, and denied coverage on the basis that the Montego did not qualify under either the Fairmont or pickup policies for coverage under the newly-acquired automobile clauses. Consequently, State Farm paid uninsured benefits to Mrs. Davidson. It also stacked basic economic loss benefits for five [1] of the vehicles on the fleet policy, resulting in payment to Mrs. Davidson of $29,513.01. Coverage on the Celebrity alone would have resulted in payment of $11,646.65 for economic loss benefits.

Subsequently, Brian Holthusen sued State Farm for his lost wages, asserting that the Montego qualified as a temporary substitute vehicle for the pickup and was thus insured under Reinhard Holthusen's insurance policy. Brian submitted an affidavit to State Farm asserting that the Montego was a temporary substitute vehicle for the pickup. State Farm agreed with him and extended liability coverage to the Montego. This action was settled out of court.

Ultimately, the trial court in this proceeding determined that the Montego was *not* a temporary substitute vehicle for the pickup and that, consequently, Brian Holthusen was *not* insured at the time of the accident. The trial court also reformed the Clinic's fleet policy, designated Dr. Davidson as the named insured for the six vehicles driven by his family, and ordered that uninsured motorist coverage on these six vehicles be stacked. Finally, the trial court determined that all six vehicles driven by the Davidson family were of the same priority level pursuant to Minn.Stat. § 65B.47 (1982), and the court allowed stacking of economic loss benefits for the six vehicles. State Farm's counterclaim for overpayment of benefits was denied.

## ISSUES

1. Did the trial court err when it determined that the Mercury Montego was not a substitute vehicle for Reinhard Holthusen's pickup truck?

2. Did the trial court err when it reformed the Clinic's fleet policy to designate Dr. Davidson as a named insured and

---

1. State Farm did not permit stacking of the vehicle owned by Clyde and Susan Davidson. Mrs. Davidson does not seek review of this determination.

thereby permitted stacking of uninsured motorist coverage on six Davidson family vehicles?

3. Did the trial court err when it determined that all six Davidson family vehicles were of the same priority for purposes of Minn.Stat. § 65B.47 (1982), thus allowing stacking of economic loss benefits for all six vehicles?

## ANALYSIS

### I.

The definition of a temporary substitute vehicle in the policy for Reinhard Holthusen's pickup truck reads as follows:

> **Temporary Substitute Car**—means a **car** not owned by **you** or **your spouse**, if it replaces **your car** for a short time. * * **Your car** has to be out of use due to its breakdown, repair, servicing, damage or **loss. A temporary substitute car** is not considered a **non-owned car.**

This definition when coupled with the definition of an insured in Reinhard Holthusen's insurance policy may be general enough to bring the Montego within its scope, if the definition is liberally construed. However, our supreme court has stated:

> There is language in [*St. Paul Fire & Marine Insurance Co. v. Nyquist*, 286 Minn. 157, 175 N.W.2d 494 (1970)], which suggests by way of dictum that where an owner has only one policy on one car, the policy will afford coverage for other cars if only one vehicle at a time is functioning. Lest the scope of that decision be too broadly construed, we restrict the effect of the language in the *Nyquist* case to the facts which gave rise to that decision and now hold that an owned vehicle not described in the policy replaces a described vehicle under only two conditions: (1) When the replaced described vehicle is not operable and for practical purposes cannot be rendered operable; or (2) the described vehicle has been sold, or possession has been transferred for purposes of sale or because title has otherwise been divested. Any

other holding would encourage the shuffling of automobiles which are not described, to afford coverage without paying a premium, resulting in the inevitable litigation which such situations spawn.

*Fitch v. Bye*, 288 Minn. 344, 349, 180 N.W.2d 866, 869–70 (1970).

The trial court in reliance upon *Fitch* determined that the Montego was not a temporary substitute vehicle at the time of the accident. This determination was supported by the trial court's findings:

> 16. At the time of the accident, the 1974 Ford pickup truck was disabled, and had been disabled for several months. The motor had been taken out of the truck, and so the truck was completely inoperable. A replacement motor had been ordered for the pickup truck at the time of the accident.

> 17. When in operation, the 1974 pickup truck was used generally for hauling wood. It was seldom driven off of the property owned by Reinhard Holthusen.

> \* \* \* \* \* \*

> 19. The Holthusen family intended to replace the Ford Fairmont with the 1973 Mercury. They had no plans to dispose of the pickup truck.

These findings are supported by competent evidence in the record, and are not clearly erroneous.

■ The primary vehicle used by the Holthusens was the Fairmont. Brian Holthusen's testimony indicates that the Montego was intended to replace the Fairmont. Reinhard Holthusen's testimony is that the truck was rarely used off the farm. At the time of the accident, Brian Holthusen was returning from a trip to town, the purpose of which was to repair the Montego. We conclude that the standard set forth in *Fitch* compels an affirmance of the trial court's determination that in these circumstances the Montego does not constitute a temporary substitute vehicle for the truck.

### II.

Principles of equity recognize that:

[a] written instrument can be reformed by a court if the following elements are proved: (1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party. These facts must be established by evidence which is clear and consistent, unequivocal and convincing.

*Nichols v. Shelard National Bank*, 294 N.W.2d 730, 734 (Minn.1980) (citations omitted). Furthermore, our supreme court has acknowledged that an insurance contract can be reformed to provide uninsured motorist coverage to a person who is not a named insured in the contract. *See Peterson v. Marlowe*, 264 N.W.2d 133 (Minn. 1977); *Kashmark v. Western Insurance Co.*, 344 N.W.2d 844 (Minn.1984).

The trial court allowed reformation of the fleet policy to include Davidson as a named insured under a theory of mutual mistake. In so doing, the trial court relied upon the following findings:

10. A fleet policy of insurance was issued to the Thief River Clinic by State Farm at the suggestion of its agent Dan Drevlow, because issuing a fleet policy was more convenient than issuing individual policies for each automobile owned and used by the Davidson and Herber families.

11. Both State Farm and Dr. Davidson intended that the policy issued to the Thief River Clinic would afford to Dr. Davidson and his family the same insurance coverage as they would have had available to them under an insurance policy issued on their individual vehicles.

12. The policy issued to the Thief River Clinic did not provide the same coverage that individual insurance policies would have provided to the various vehicles owned by Dr. Davidson and his family, and this failure was the result of a mutual mistake between Dr. Davidson and State Farm agent Dan Drevlow.

State Farm contends that the court's findings are not supported by clear and convincing evidence. We disagree.

State Farm's agent testified that when he wrote the policy he assumed that the members of the Davidson family would have the same coverage as in a family policy. While this assumption may have been true when the policy was originally written, it did not remain so after passage of the No-Fault Act. There is no testimony from the agent which indicates that his assumption changed. Herber testified in his deposition that the fleet policy was intended to give both the Davidson and Herber families "full coverage." It strains the court's credulity that Davidson would have continued insuring his family's vehicles under the fleet policy for several years if he had not believed that that policy afforded the same protection as a family policy. Finally, the premiums for the Davidson vehicles insured under the fleet policy were based upon the use of each vehicle as a family vehicle.

█ We conclude that the trial court did not err in reforming the policy to designate Dr. Davidson as a named insured. The trial court's determination that the fleet policy failed to express the intentions of State Farm to sell, and Davidson and Herber to buy, insurance which would provide the same coverage as individual policies, is supported by clear and convincing evidence. Reformation of the policy assures that Davidson's family will receive the full coverage which was paid for and which was believed to be provided.

### III.

The priority of applicability of security for payment of economic loss benefits is governed by Minn.Stat. § 65B.47 (1982).

Subdivision 2 of section 65B.47 provides:

In case of injury to an employee, or to his spouse or other relative residing in the same household, if the accident causing the injury occurs while the injured person is driving or occupying a motor vehicle other than a commuter van fur-

nished by the employer, the security for payment of basic economic loss benefits is the security covering the vehicle or, if none, the security under which the injured person is an insured.

Minn.Stat. § 65B.47, subd. 2 (1982).

Subdivision 4 of section 65B.47 provides: In all other cases, the following priorities apply:

(a) The security for payment of basic economic loss benefits applicable to injury to an insured is the security under which the injured person is an insured.

Minn.Stat. § 65B.47, subd. 4 (1982).

The trial court determined that, despite the fact that the Chevrolet Celebrity was owned by the Clinic, subdivision 2 of section 65B.47 was not applicable. The court determined that all six Davidson family vehicles were of the same priority with respect to the statute, and ordered that Mrs. Davidson was entitled to stack economic loss benefits on all six. The trial court's rationale for this determination was that the Celebrity could not be a business vehicle when it was primarily used for personal and family purposes.

State Farm argues that Dr. Davidson was an employee of the Clinic and subdivision 2 of section 65B.47 applies. State Farm cites *Roepke v. Western National Mutual Insurance Co.*, 302 N.W.2d 350 (Minn.1981), and *Kuennen v. Citizens Security Mutual Insurance Co.*, 330 N.W.2d 886, 887 (Minn.1983), in support of its position that economic loss benefits cannot be stacked under the facts present here.

In *Roepke*, the decedent was the sole shareholder of the named insured corporation, the insured vehicles were used as family vehicles, and neither the decedent nor his household owned other vehicles. The court pierced the corporate veil and allowed stacking of benefits pursuant to Minn.Stat. § 65B.47. Subsequently, in *Kuennen*, the supreme court stressed that *Roepke* was limited to its unique facts. In disallowing piercing of the corporate veil and stacking of economic loss benefits in *Kuennen*, the court noted that the decedent there was a majority stockholder, used only two of four corporate vehicles as family vehicles, and cautioned:

We did not intend *Roepke* as the first step toward apportioning corporate policies to shareholders on the basis of stock ownership and number of company cars put to family use.

*Kuennen*, 330 N.W.2d at 887.

■ State Farm's reliance on *Roepke* and *Kuennen* is misplaced. Here, the trial court properly reformed the policy to include Dr. Davidson as a named insured. Thereafter, there was no need to consider his status as an employee of the Clinic. Neither was it necessary to consider piercing the corporate veil. Subdivision 2 of section 65B.47 was inapplicable after Dr. Davidson became a named insured in the policy.

The premiums charged on the Davidson family vehicles were computed based on which family members would be driving each vehicle and were identical to those premiums charged under individual policies. Dr. Davidson paid premiums on each of his family vehicles. He was an insured under the provisions of subdivision 4 of section 65B.47. He was entitled to receive the coverage for which he paid. *Wasche v. Milbank Mutual Insurance Co.*, 268 N.W.2d 913 (Minn.1978). The trial court did not err in directing that economic loss benefits be stacked on the Davidson family vehicles.

## DECISION

The trial court did not err when it determined that the Montego was not a temporary substitute vehicle for the pickup truck; when it reformed the Clinic fleet insurance policy to designate Dr. Davidson as an insured and allowed stacking of uninsured motorist coverage on six Davidson family vehicles; and when it permitted stacking of economic loss benefits on those vehicles.

Affirmed.