Richard O. NICHOLS et al.,
Respondents,

v.

SHELARD NATIONAL BANK, Defendant and Counterclaimant, Appellant,

v.

Richard O. NICHOLS et al., Defendants on Counterclaim,

The Farmers and Mechanics Savings Bank of Minneapolis, Defendant on Counterclaim, Respondent.

No. 50018.

Supreme Court of Minnesota.

July 3, 1980.

Rehearing Denied Aug. 1, 1980.

Maslon, Kaplan, Edelman, Borman, Brand & McNulty and William Z. Pentelovitch, Minneapolis, for appellant.

Tanick & Heins and Marshall H. Tanick, Minneapolis, for Nichols, et al.

Sally I. Bans, Minneapolis, for The Farmers and Mechanics Savings Bank of Minneapolis.

Heard before OTIS, PETERSON, and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

The plaintiffs, Richard and Janice Nichols, brought this action in Hennepin County District Court seeking to have a $30,000 second mortgage on their home held by the defendant, Shelard National Bank, declared null and void. The bank counterclaimed to foreclose the mortgage. The Nichols responded by requesting that the mortgage either be declared null and void or be reformed "to embody the actual agreement of the parties." The trial court, hearing the case without a jury, ordered that the mortgage be reformed from $30,000 to $10,000

and that the mortgage, as reformed, be foreclosed. The bank argues on appeal that the trial court's findings are manifestly contrary to the evidence and that the trial court erred in reforming the mortgage instrument from $30,000 to $10,000. We reverse.

In the fall of 1973, Richard Nichols, who had been in the restaurant business for 25 years, formed Cyrano's Restaurant, Inc. Mr. Nichols was the sole shareholder and president and Mrs. Nichols was named secretary-treasurer, but she was not active in the business. Cyrano's opened in January 1974, in Plymouth, Minnesota. Defendant Shelard National Bank provided Cyrano's with a loan for $150,000 in order to equip the restaurant. The loan was secured by the equipment, as well as by the personal guaranty of Charles Belgaard, the president of the corporation that leased the restaurant building to Cyrano's. Plaintiffs also raised funds for starting the business by borrowing on their life insurance policies and refinancing their home with the Farmers and Mechanics Savings Bank of Minneapolis.[1]

Business at the restaurant was good until early in 1975, when the Radisson Plymouth opened for business across the street from Cyrano's. Business then declined, and Cyrano's had to take a number of short-term loans for operating expenses. When defendant Shelard was unable to provide any additional financing, Nichols borrowed $15,000 from the First National Bank of Hopkins, secured by accounts receivable and inventory. In August and December 1975, defendant made two $10,000 90-day loans to Cyrano's, each of which was secured by accounts receivable and inventory. The defendant's security interest in Cyrano's was subordinate to the security interest in the same collateral held by the First National Bank of Hopkins. In November 1975, Cyrano's borrowed $25,000 from the Citizens State Bank in St. Louis Park in order to pay a portion of federal and state taxes,

pledging as collateral all outstanding shares in Cyrano's. The defendant was aware that Cyrano's had borrowed from these other banks. The two $10,000 loans with defendant were renewed in February 1976, and again in April, secured by the same collateral.

Cyrano's continued to go downhill financially. By June 1976, plaintiff owed defendant approximately $110,000 on the original $150,000 note, plus $20,000 due to the renewed $10,000 notes; owed to the state and federal government for taxes; owed $25,000 to Citizens State Bank; owed food suppliers; and owed $10,000 to First National Bank of Hopkins. Early in June, the First National Bank of Hopkins stated it would foreclose on its note, and therefore put Cyrano's out of business, unless it received a $10,000 second mortgage on plaintiffs' house. Plaintiffs refused to give the requested second mortgage. Several meetings, at which the financial condition of Cyrano's was discussed, took place in May and June 1976. The parties disagree regarding exactly what transpired at these meetings.

Gerald Wright, the president of defendant Shelard National Bank, testified that on May 3, 1976, he met with plaintiff and Sheldon Wert, the chairman of the bank's board of directors, in order to discuss ways for Cyrano's to acquire additional working capital. Plans for obtaining a partner to buy into the business had fallen through. They also discussed the possibility of turning the restaurant into a disco. The plaintiff's principal suggestion, which he saw as the last resort to save his business, was to convert part of the restaurant into a peanut bar, which he felt could be done for $10,000.

On May 23 or 26, another meeting took place in Wright's office. The plaintiff gave Wright and Wert a list of creditors, showing an indebtedness of more than $235,000. The parties discussed the threat from First Hopkins to foreclose on its $10,000 note, and plaintiff was told that if defendant were to

---

1. The refinanced mortgage was for $30,000. The value of the property was approximately $50,000.

pay off the Hopkins bank, it would combine that $10,000 with the two existing $10,000 notes and secure the entire $30,000 with a second mortgage on the plaintiffs' home. Plaintiff indicated that First Hopkins had also wanted a second mortgage on his home and he had refused. He said he did not like the idea and would in any case have to talk to his wife and his attorney before deciding. Immediately after the meeting, defendant ordered a title insurance policy binder on the plaintiffs' home in the amount of $30,-000, and this binder was issued on June 7, 1976.

Another meeting was held on June 22, attended by Wert, Wright, the plaintiff and his attorney, Belgaard, and Harry Yaffee, who was the general manager of Belgaard's corporation. The meeting was called in order to discuss past due payments on the large loan and past due rent payments, but the major concern of all parties was the threat by the Hopkins bank to foreclose and take all of Cyrano's inventory.[2] There was some discussion of plaintiff's peanut bar idea; plaintiff felt it was the only opportunity left to save his restaurant.[3] Wert told the plaintiff that the bank would lend him $10,000 only if it could renew the $20,000 in outstanding notes, combine it with the $10,-000 note, and take a second mortgage on his home for $30,000. According to Wright's testimony, plaintiff's lawyer strongly objected to this plan, but by the end of the meeting the plaintiff agreed, against his lawyer's advice, because he felt it was necessary in order to stay in business. Thus, the bank's understanding of the agreement was that it would lend plaintiff $10,000 to pay off the Hopkins bank and renew the two $10,000 notes that were now due, in return for a $30,000 second mortgage on plaintiff's home. Wright testified that the bank never promised, or ever intended to promise, to lend any money to set up a peanut bar in the restaurant.

Plaintiff's understanding of the meeting and the agreement was different, however. Plaintiff testified that, although Wert was insistent upon receiving a second mortgage to secure the outstanding $20,000 he owed to the bank, plaintiff was just as insistent that he would not do this. Plaintiff testified that he indicated to Wert, against his lawyer's advice, that if he could obtain $10,-000 "fresh money" to build his peanut bar and stay in business, then he would consider getting a second mortgage on his home for $10,000. He had already been working on construction of the peanut bar for about two months. His understanding was that the bank would have to pay off the Hopkins bank anyway, in order to protect its security interest in Cyrano's accounts receivable and inventory, and that it would further lend him $10,000 to finish building the peanut bar, secured by a second mortgage for $10,000. Plaintiff said he discussed whether or not to agree to a $10,000 mortgage with his attorney and decided to do it, against his attorney's advice. Plaintiff's attorney also testified that the mortgage was to be for $10,000. Plaintiff testified he would never have signed a $30,000 note to pay off money already owed without receiving any "fresh money" to enable him to continue his business.

A note and mortgage were drawn up by the bank in the amount of $30,000. There is no question that plaintiff and his wife came into the bank approximately one week

**2.** Defendant was concerned that if First Hopkins foreclosed, defendant would lose the collateral for the two $10,000 notes, since First Hopkins' lien on the security was superior to defendant's. The approximate value of the security in June 1976 was just under $10,000. Plaintiff testified that defendant was not concerned about the $150,000 loan, because it was secured by equipment and Belgaard's personal guaranty. Defendant wrote Belgaard on June 3, 1976, asking for payment on the loan, which was four months in default. Ultimately, defendant took possession of the equipment and resold it for the amount that paid its note, so it did not have to collect any money from Belgaard.

**3.** At this meeting, Belgaard went over the plans and financial projections for the peanut bar presented to him by the plaintiff. According to Yaffee, Belgaard doubted that the peanut bar would save plaintiff's business. Plaintiff's attorney testified, however, that Belgaard stated he would help obtain some of the items needed for the peanut bar.

after the June 22 meeting and signed six documents which set out that the mortgage was for $30,000. Plaintiffs said they did not read the documents but relied on their understanding of the agreement reached at the June 22 meeting that the mortgage would be for $10,000.

The First Hopkins note was paid by defendant on June 28, 1976. Plaintiff apparently never received any money to construct his peanut bar. At the time of trial, the unpaid balance on the $30,000 note was $27,855.78.

■ The issue for our determination is whether the trial court erred in reforming the mortgage instrument. Plaintiffs argue that the reformation ordered by the trial court is justified because of a mutual mistake of fact. A written instrument can be reformed by a court if the following elements are proved: (1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party. *Theros v. Phillips*, 256 N.W.2d 852, 857 (Minn.1977); *Fritz v. Fritz*, 94 Minn. 264, 102 N.W. 705 (1905). These facts must be established by evidence which is clear and consistent, unequivocal and convincing. *Id.*

■ The evidence, even when viewed in the light most favorable to the plaintiff, does not support the trial court's order for reformation, under a theory of either mutual mistake or unilateral mistake and misrepresentation. Were there fraud, misrepresentation or inequitable conduct by the defendant, reformation would be proper; but, even accepting the plaintiff's testimony as true, no fraud by the bank can be found. Plaintiff was not told by Wright when he signed the documents that they were for $10,000. Defendant testified he told plaintiff they were for $30,000, and plaintiff testified Wright said nothing about the amount of the mortgage. Moreover, in order to have a mutual mistake, it is necessary that both parties agree as to the con-

tent of the document but that somehow through a scrivener's error the document does not reflect that agreement. There is no evidence here of scrivener's error, since the documents did reflect the defendant's understanding of the agreement.

■ When both parties acted in good faith and neither misled the other, but nevertheless each party was mistaken and thought he was making a different contract from what the other party supposed he was making, reformation is not an appropriate remedy. *Bancharel v. Patterson*, 64 Minn. 454, 67 N.W. 356 (1896). Absent ambiguity, fraud or misrepresentation, a mistake of one of the parties alone as to the subject matter of the contract is not a ground for reformation. *Olson v. Shephard*, 165 Minn. 433, 206 N.W. 711 (1926).

Furthermore, had plaintiffs read the documents before they signed them, their mistake as to the contents would have been discovered before they suffered any harm. Were this court to allow reformation, it would not only destroy the defendant's right to rely on plaintiffs' written assent to the agreement, but would reward plaintiffs for their negligence. Unfortunate as the situation may be for the plaintiffs, this case illustrates the reason for the Statute of Frauds, requiring most contracts to be in writing: to prevent a party from being held responsible by oral, and perhaps false, testimony, for a contract he claims he never made. "[T]he purpose of the statute is to guard not only against the dishonesty of parties and the perjury of witnesses, but against the misunderstanding and mistakes of honest men." 73 Am.Jur.2d *Statute of Frauds* § 510 (1974).

Reversed.