FIDELITY AND GUARANTY
INSURANCE COMPANY,
Plaintiff,

v.

GLOBAL TECHNOLOGIES,
LTD., Defendant.

No. CIV. 99–410ADMAJB.

United States District Court,
D. Minnesota.

Oct. 24, 2000.

Jeffrey J. Bouslog, Andrew S. Hansen, Oppenheimer, Wolff & Donnelly, Minneapolis, MN, for Plaintiff.

Thomas J. Shroyer, Jerrie M. Hayes, Moss & Barnett, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

## I. INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United States District Judge on September 12, 2000, pursuant to Plaintiff's Motion for Summary Judgment [Doc. No. 42 ]. This dispute arises out of two umbrella insurance policies issued by Plaintiff Fidelity and Guaranty Insurance Co. ("Fidelity") to Defendant, now known as Global Technologies ("Global") for the years 1997–1999. Fidelity's complaint asks that the two policies issued to Global be reformed to exclude insurance coverage for products liability because the mutual intent of the parties was to omit products liability coverage. For the reasons set forth below, Fidelity's motion is granted.

## II. BACKGROUND

### A. Parties

Plaintiff in this action is Fidelity and Guarantee Insurance Company. Defendant is Global Technologies, Ltd. At the time the relevant actions took place, Global was known as Interactive Flight Technologies ("IFT"). However, because IFT was acquired by another company in 1998 and renamed as Global, all references to IFT will be to "Global."

### B. Factual Background

Global manufactures and sells entertainment systems to airlines for use by passengers on their aircraft. Not long after his appointment as Global Chief Financial Officer ("C.F.O.") in October 1996, John Alderfer decided that Global should hire a larger insurance broker to assist in making insurance decisions for the rapidly developing company. *See* Alderfer Dep. at 65. In the middle of March 1997, Alderfer retained Near North Insurance Brokerage, Inc. ("Near North") as Global's exclusive insurance broker. *See id.* at 62. Devra Gerber ("Gerber") was the supervisor of the Global account at Near North. *See* Gerber Dep. at 20. Near North was then asked to prepare a written report of Global's operations and insurance coverage for a possible buyer of Global technology. *See* Hayes Aff. Ex. G. The report details Global's existing commercial general liability insurance coverage with Northbrook Insurance Company ("Northbrook"). *See id;* Hansen Aff. Ex. E. The analysis of Global's 1996–97 umbrella [1] policy with Northbrook notes that there is a products liability exclusion for that policy. *See* Hayes Aff. Ex. G. Furthermore, the Near North report's only objective in regards to buying Global's next umbrella policy is to "review and verify" the policies underlying the umbrella coverage. *Id.* The initiative list in no way identifies a need or desire to obtain umbrella insurance without a products liability exclusion. *See id.* Global's products liability insurance was covered by a separate policy with Associated Aviation Underwriters ("AAU") for the relevant duration of this dispute. *See id;* Campbell Dep. at 18.

Less than two months after the report, Near North sent Fidelity an application

---

**1.** As used by the parties in this case, an umbrella insurance policy is a layer of insurance that provides additional coverage over and above the excess limits of another policy. *See* Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 3.11(a)(2) (1st ed.1988). For example, where an insured already has policy coverage up to an amount of $500,000, $400,000 of umbrella coverage would only cover damages between $500,000 and $900,000. *See id.* The $400,000 umbrella policy "sits above" the $500,000 "underlying policy." In some contexts, "excess" and "umbrella" coverages are not synonymous, but the distinction has no application to the instant facts.

for quotes on umbrella and other forms of insurance for Global for 1997–98. *See* Hayes Aff. Ex. H. The application did not request products liability coverage as part of the umbrella or commercial general liability ("CGL") policies despite the presence in the application of opportunities to solicit such coverage. *See id.* Furthermore, the application did not list the AAU products liability policy as one that would sit under the umbrella policy. *See id;* Gerber Dep. at 71, 72.

After getting responses from various insurers, Near North sent a summary of Fidelity's proposal to Alderfer at Global for his authorization. *See* Hayes Aff. Ex. I. The summary did not list products liability as excluded from the umbrella coverage. *See id.* However, Gerber's cover sheet to Alderfer stated that coverage was "enhanced from the expiring program [with Northbrook] as highlighted in the Executive Summary." *Id.* Neither the Executive Summary nor the umbrella policy's highlight section notes the removal of the products liability exclusion. *See id.* The only highlight listed under the umbrella section is that the premium is reduced by half from Global's current umbrella policy. *See id.* Alderfer then told Gerber to accept the Fidelity proposal. *See* Hayes Aff. Ex. J. When the policy was issued, a page of the 1997–98 policy listed that there was a $10 million cap for products liability umbrella coverage. *See* Hayes Aff. Ex. K. The umbrella policy did not list the AAU products liability policy along with the other policies underlying the umbrella coverage. *See id.*

In March of 1998, Near North submitted to Fidelity a renewal application for Global. *See* Hayes Aff. Ex. L. Again, the application did not request any coverage for products liability in the umbrella or other sections of the application. *See id.* On May 8, 1998, Near North sent Alderfer a renewal proposal for 1998–99 according to the response from Fidelity. *See* Hayes Aff. Ex. M. This summary listed products liability coverage as excluded from the um-

brella policy. *See id.* It also specified that there was no change in the umbrella premium. *See id.* Alderfer requested Gerber at Near North to bind Global to Fidelity's proposal. *See* Alderfer Dep. at 88; Gerber Dep. at 109. When the 1998–99 policy was issued, it again showed $10 million of products liability coverage under the umbrella policy. *See* Hayes Aff. Ex. N. The policy again failed to list the AAU products liability policy along with other Global policies underlying the umbrella coverage. *See id.*

On September 2, 1998, a plane carrying Global technology, Swissair MD–11 flight number 111, crashed near Nova Scotia. *See* Gomer Aff. ¶ 13. At Global's request, Near North notified all Global insurance carriers of potential claims. *See* Hansen Aff. Ex. V; Gerber Dep. at 118–20. After reviewing Global's policy, Fidelity noticed a mistake and sent a letter to Global indicating that there was an error in the umbrella policy regarding the inclusion of the products liability coverage. *See* Hayes Aff. Ex. P. Fidelity has denied coverage to Global for products liability claims. *See* Def. Opp'n Mem. at 6.

## III. ANALYSIS

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Procedure provides that summary judgment shall be awarded to a party if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. When ruling on a summary judgment motion, a court must view the evidence "in the light most favorable to the nonmoving party." *Dush v. Appleton Electric Co.,* 124 F.3d 957, 962–63 (8th Cir.1997) (citing *F.D.I.C. v. Bell,* 106 F.3d 258, 263 (8th Cir.1997)). However, a "nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." *F.D.I.C.,* 106 F.3d at 263 (citing *Rolscreen Co. v. Pella Prods. of St. Louis, Inc.,* 64 F.3d 1202, 1211 (8th

Cir.1995)). For a non-moving party to defeat summary judgment, the alleged factual dispute must be " 'outcome determinative under prevailing law,' that is, it must be material to an essential element of the specific theory of recovery at issue." *Belmore v. City Pages, Inc.*, 880 F.Supp. 673, 676 (D.Minn.1995) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992)).

## B.  Summary Judgment

■ Fidelity requests that this Court reform its 1997–98 and 1998–99 insurance contracts with Global to exclude products liability coverage from the umbrella policies. Under Minnesota law, a court may reform a written contract if: "(1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party." *Nichols v. Shelard National Bank*, 294 N.W.2d 730, 734 (Minn.1980). These elements must be substantiated by "clear and consistent, unequivocal and convincing" evidence. *Id.*

Fidelity alleges that all three elements are met to allow reformation of the policies to meet the parties' intent. Fidelity claims that there was a valid agreement between the parties expressing their real intention to buy/sell umbrella insurance without any products liability coverage. In support of this claim, Fidelity submits strong evidence of the intentions of both parties.

### 1.  Intent of Global

■ Global's intention is first evidenced on March 11, 1997, when Near North initially examined Global's existing insurance policies and issued its recommendations for changes in the coverage in a report to Global. Near North expressed that Global's umbrella policy excluded coverage for products liability and made no recommendation to remove the exclusion in their next umbrella policy. *See* Hayes Aff. Ex. G. Moreover, this report's section on products liability does not list adding products liability coverage under an umbrella policy as one of its initiatives concerning Global's products liability coverage. *See id.* That this report in no way intimated that products liability coverage should be added to the umbrella coverage suggests that Near North and Global did not desire to change its current umbrella policies regarding the products liability exclusion. Devra Gerber, the head of Global's account at Near North, testified that she did not suggest to Global that they purchase a new umbrella policy with coverage for products liability. *See* Gerber Dep. at 53. In *Polaroid Corp. v. Travelers Indemnity Co.*, 414 Mass. 747, 610 N.E.2d 912, 918 (1993), the court looked to the advice of the broker to the insured about what coverage is needed to help determine the contents of the agreement between the insurer and insured.

The intent to exclude the products liability coverage is also buttressed by examination of the context of the applications provided by Near North as Global's insurance broker less than two months after the date of the report. On May 7, 1997, Near North sent out an application to Fidelity that explicitly declined products liability coverage as part of the umbrella policy. *See* Hayes Aff. Ex. H. Moreover, Near North did not list the AAU policy in a section in the application for establishing what policies lie under the umbrella coverage. *See id.* Clearly, the premiums charged for umbrella policies are based upon the existence and amount of the policy(s) it sits above; an application desiring umbrella coverage for products liability would pay a higher premium. Hence, Near North's non-inclusion of the AAU policy in the application further indicates that Near North did not intend to contract for products liability insurance as part of the umbrella policy. *See* Macek Dep. at 32; Gerber Dep. at 72.

■ Near North employees also testified that insureds seeking products liabili-

ty coverage as part of their umbrella policy only do so when they also desire products liability coverage as part of their CGL policy. *See id.* Here, Global's application specifically refused products liability coverage as part of their CGL insurance. *See* Hayes Aff. Ex. H. Fidelity did not include any information on the sales of Global's products that would be necessary for an insurance company to make a quote on products liability insurance. *See* Gerber Dep. at 70–71. The coverage requested in an application is relevant evidence in the determination of the eventual agreement's contents. *See Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.,* 813 F.Supp. 1147, 1149–50 (W.D.Pa.1992); *Polaroid,* 610 N.E.2d at 918.

Upon receiving a response from Fidelity, Near North compiled a condensed summary of Fidelity's proposal for Global. *See* Hayes Aff. Ex. I. This report is the only evidence advanced by Global that Near North intended to buy products liability coverage. *See* Hayes Aff. Ex. I. Global asserts that because this summary did not list products liability as an exclusion under the umbrella policy, there is a factual dispute as to Near North's intention to buy products liability insurance. *See id.* To the contrary, the summary is evidence Near North did not seek or agree to buy products liability coverage for Global. The report, true to its title, is a summary and is not intended to be a complete analysis of all aspects of the coverage. *See id.* Near North's letter accompanying the report pointed out to Global that coverage "enhancements" from Global's previous policy were highlighted in the Executive Summary. *See id.* Because obtaining $10 million in additional products liability coverage as compared to the previous policy would be "enhanced coverage," the fact that no identification of such coverage is made in the Executive Summary further demonstrates that Near North could not reasonably believe it was acquiring such coverage. *Id.*

The telling fact that the premium for the umbrella policy had been reduced by 50% from Global's previous policy (which did not include $10 million in products liability coverage), further belies the argument that without discussion an additional $10 million of coverage was added to the policy. *See id.* Had Near North actually purchased $10 million of additional coverage at half the price of Global's last insurance broker's cost, it would have been touted as a highlight in the Executive Summary or the umbrella policy summary.

Additionally, neither the Executive Summary nor the report's summary of Global's "Aviation Products Liability" coverage reflects that any additional products liability coverage was obtained. *See id.* The only company listed as a carrier in that section was AAU; Fidelity was not noted or inferred as providing any products liability coverage. *See id.*

After getting confirmation from Global, Near North concluded an agreement with Fidelity for the agreed upon insurance package. *See* Hayes Aff. Ex. J. Gerber, in charge of Global's account at Near North, testified unequivocally in her deposition that there was no intent to buy products liability coverage under the umbrella policy. *See* Gerber Dep. at 89.

Fidelity presents evidence that Near North continued to believe that they did not contract to buy products liability coverage with Fidelity for Global even after the issuance of the policy with the alleged error. Nearly ten months after the alleged erroneous policy was issued, Near North's renewal application for 1998–99 once more did not request any products liability coverage, did not provide information on which to base a quote for that insurance, and did not list the AAU policy as one that would underlie the umbrella policy. *See* Hayes Aff. Ex. L. Again, as was the practice, Near North sent a summary to Alderfer. *See* Hayes Aff. Ex. M. This time, the summary did note that the umbrella policy did not cover products liability. *See id.* It also remarked that the

umbrella premium would remain unchanged. *See* Hayes Aff. Ex. M. Alderfer again requested that Near North bind Global to the proposal, despite being notified that Near North was not going to buy umbrella insurance with products liability coverage. *See* Alderfer Dep. at 88; Gerber Dep. at 109. Both Gerber and another Near North employee testified that Global did not intend to buy products liability insurance as part of the renewal of the umbrella policy. *See* Gerber Dep. at 117; Macek Dep. at 23. There is no genuine issue of material fact that Near North intended to buy umbrella insurance for Global without products liability coverage.

Global further contends there is a genuine issue of fact about whether or not Global and Near North understood there to be no products liability protection under the umbrella coverage. Global asserts that reformation of a clear policy cannot be determined on a summary judgment motion, Near North's intention cannot be attributed to Global, and that Global's C.F.O., John Alderfer, intended to buy products liability coverage under the umbrella policy.

■ These arguments also fail to raise a genuine issue of fact. First, an action reforming an alleged mistake in an unambiguous insurance contract can be decided in favor of a plaintiff on summary judgment. *See Polaroid Corp. v. Travelers Indemnity Co.*, 414 Mass. 747, 610 N.E.2d 912 (1993). The fact that the contract's language is explicitly at odds with the alleged reformation does not in itself create a genuine issue of material fact regarding the parties' intentions. *See id.* at 919 (citing *Federal Deposit Ins. Corp. v. Csongor*, 391 Mass. 737, 464 N.E.2d 942, 945–46 (1984)).

■ An analysis of the relationship between Near North and Global establishes that Near North was the exclusive insurance broker for Global and that there were no direct communications between Global and Fidelity. *See* Gerber Dep. at 34. All negotiations between Global and Fidelity were conducted by Near North. *See id.* As a result, it is undisputed that Near North and Global operated under an agent/principal relationship. *See* Hansen Aff. Ex. AA ¶ 4. Under Minnesota law, because Near North was Global's agent in respect to the transaction at issue, Global is liable for contracts made by Near North in its name. "Where an agent, acting for a disclosed principal, enters into a contract with third persons for and on account of his principal and in his name, the contract is that of the principal." *Kost v. Peterson*, 292 Minn. 46, 193 N.W.2d 291, 294 (1971).

More specifically, the agent's knowledge and intent are also binding on the principal. *See Beaudry v. United States*, 106 F.2d 987, 988 (5th Cir.1939); *Jaquith v. Davenport*, 191 Mass. 415, 78 N.E. 93, 94 (1906). Where the agent is acting for the benefit of a principal, a principal "cannot take the benefits of the act, without also taking the burdens resulting from the agent's knowledge and intentions." *Beaudry*, 106 F.2d at 988.

In *Green v. SHRM Catering Inc.*, 710 F.Supp. 174, 178 (W.D.La.1987), the court held that the intent of the insured is determined by a broker's intent because the broker is the insured's agent. The court used the insured company's name in discussing the evidence of the broker's intent and negotiation of the insurance agreement with the insured. *See id.* The *Green* court explicitly relied on the testimony of the insured's broker that the agreement was not to include a certain coverage despite the insured's challenge to reformation. *See id.* at 177. Even though an application is filled out by the broker and not the insured, courts have looked to the insurance application to determine the intent of the parties in respect to the creation of an insurance agreement. *See Twin City Fire Insurance Co. v. Pittsburgh Corning Corp.*, 813 F.Supp. 1147, 1150–51 (W.D.Pa.1992); *Polaroid Corp. v. Travelers Indemnity Co.*, 414 Mass. 747, 610 N.E.2d 912, 918 (1993).

Here, it is undisputed that all contact with Fidelity was done by Near North as Global's agent. The parties to the negotiations giving rise to the insurance agreement were Near North and Fidelity. The first requirement of the Minnesota test for reformation is that "there was a valid agreement between the parties expressing their real intentions." *Nichols v. Shelard National Bank*, 294 N.W.2d 730, 734 (Minn.1980). Global gave Near North the exclusive and unrestricted power to negotiate an insurance contract for them with Fidelity. Global is bound by Near North's intent in this factual situation. Because uncontroverted evidence establishes that Near North intended to buy umbrella insurance without products liability coverage, Global is bound by such a determination regardless of its own intentions.

Anticipating this finding, Global next argues that even if it is bound by Near North's intent, its intent should be considered in addition to Near North's. As discussed *supra*, where it is uncontroverted that the agent is the sole communicator/negotiator, it is not proper to consider the principal's intent. Regardless of this fact, Global has not introduced sufficient evidence to raise a question of fact as to what kind of coverage was intended even when considering its own intentions. Alderfer's cryptic deposition testimony that he "thought all along when Near North became the broker that we had $10 million of umbrella coverage" and that he "did not think it was restricted" does not raise a question of fact precluding summary judgment. *See* Alderfer Dep. at 189. Alderfer later admitted when shown the earlier Northbrook umbrella policy that it did not provide products liability coverage. *See id.* at 190. Although Global's brief claims Alderfer communicated to Near North an intent to buy products liability coverage as part of the umbrella, the pages of Alderfer's testimony cited do not support such an assertion. *See* Def. Opp'n Mem. at 4; Alderfer Dep. at 189–90.

Additional evidence regarding the 1998–99 renewal policy indicates that it is even more clear that there is no evidence raising a question of fact of Global's intent regarding that policy. Near North's summary of the 1998–99 renewal sent to Alderfer for his approval explicitly listed products liability as an exclusion under the umbrella policy. *See* Hayes Aff. Ex. M. Because Alderfer did not dispute the summary or request Near North do otherwise, there is no question of fact that Alderfer knew Global was not buying products liability coverage as part of its 1998–99 renewal policy, regardless of his understanding of the 1997–98 policy. In the face of strong evidence controverting his testimony, all his ambiguous testimony does not raise a question of fact material to the question of whether or not Near North intended to procure products liability coverage, even if Global's intent is considered material to the determination of the terms of the insurance agreement between Fidelity and Near North. This is particularly evident regarding the 1998–99 renewal policy.

**2. Intent of Fidelity**

Fidelity presents ample evidence as to its intent when agreeing to provide Global with insurance coverage. First of all, Fidelity introduced evidence that its insurance quote was based upon the insurance application filed by Near North on Global's behalf that refused any products liability coverage. *See* Hansen Aff. Ex. O. Additionally, it presented uncontroverted evidence that its underwriting guidelines do not permit Fidelity to provide aviation related insurance, *see* Thoma Aff. ¶ 11., and that Global's products are aviation related. *See* Gomer Aff. ¶ 4. Such company policies are a further indication of the insurer's intent. *See Polaroid*, 610 N.E.2d at 918. As previously discussed, Fidelity's quote for umbrella insurance to Global was a 50% reduction of Global's previous premium even though it is alleged that this policy included an additional $10 million of products liability coverage. *See* Hayes

Aff. Ex. I. The fact that Fidelity charged such a drastically lower price indicates that the Fidelity did not believe it was agreeing to provide $10 million in products coverage to Global as part of the umbrella policy. *See Twin City Fire Insurance Co.,* 813 F.Supp. at 1150 ("if [insured] desired broader coverage with less exclusion as to asbestos claims, and if [insurer] had been willing to provide such expanded coverage, an increase in premium would have been the factor that would best evidence such an intent"); *Polaroid,* 610 N.E.2d at 918 n. 12 (the fact that a premium of $85,000 was charged for allegedly greater coverage than the insured's previous policy that had a premium of $95,000 was relevant to prove that the insurer's intention was to not provide that additional coverage). Finally, both of the allegedly erroneous policy declarations did not list the AAU products liability policy with the other policies that underlie the umbrella policy. *See* Hayes Aff. Ex. K; Aff. Ex. N.

The evidence thus establishes that there is no question of fact that the first element of reformation that "there was a valid agreement between the parties expressing their real intentions" has been established by "clear and consistent, unequivocal and convincing" evidence. *Nichols v. Shelard National Bank,* 294 N.W.2d 730, 734 (Minn.1980).

### 3. Second and Third Elements of Reformation

Because the written insurance policy failed to exclude products liability coverage as was the actual intention of the parties, there is no question of fact that "the written instrument failed to express the real intentions of the parties." *Id.* This element has been established by clear and convincing evidence. *See id.*

 The third and final element of reformation of a contract is that the contractual mistake is mutual to the parties. *See id.* Both the line above and below the line for products liability coverage properly lists the amount of $10 million. *See* Hayes

Aff. Ex. K; Hayes Aff. Ex. N. The mistakes at issue are putting the amount of $10 million in the blank for products liability coverage between the two blanks properly marked with $10 million. *See id.* Because of the previous findings, it is clear that the writings contravened the real intentions of the parties and that the errors were unintentional and not unlike a scrivener's error. Minnesota law holds that a mistake in the writing of the policy may be considered a mutual one, even if one of the parties is at fault. *See Haley v. Sharon Tp. Mut. Fire Ins. Co.,* 147 Minn. 190, 179 N.W. 895, 897 (1920); *accord Mutual Life Ins. Co. v. Metzger,* 167 Md. 27, 172 A. 610, 611 (1934); 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 27.28 (3d ed.1997). The final element for reformation is thus satisfied by clear and convincing evidence. *See Nichols,* 294 N.W.2d at 734. There is no genuine issue of fact that the evidence establishes by clear and convincing proof that the umbrella insurance contracts at bar should be reformed to exclude products liability coverage.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for Summary Judgment [Doc. 42] is GRANTED.

**LET JUDGMENT BE ENTERED ACCORDINGLY**