DIGITAL CONTROL INCORPORAT-
ED and MERLIN TECHNOLO-
GY, INC., Plaintiffs,

v.

RADIODETECTION CORPORATION,
Defendant.

No. C03–2422C.

United States District Court,
W.D. Washington.

Nov. 14, 2003.

———————

Aaron Keyt, Renton, WA, Brian Chung Park, Paul T. Meiklejohn, Dorsey & Whitney LLP, Seattle, WA, for Plaintiffs.

Kenneth Sheehan, Peder Garske, Baker & Hostetler, Washington, DC, Martin Truman Crowder, Karr Tuttle Campbell, Seattle, WA, for Defendants.

## ORDER

COUGHENOUR, Chief Judge.

This matter comes before the Court on Defendant's Motion to Stay Court Proceedings And Compel Arbitration (Dkt. No. 8). The Court has reviewed the papers submitted by the parties and determined that oral argument is not necessary. For the reasons explained below. Defendant's motion is hereby DENIED.

## I. BACKGROUND

This case arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq. Plaintiffs Digital Control Incorporated ("DCI") and Merlin Technology, Inc. ("Merlin") allege that Defendant Radiodetection Corporation ("RDC") manufactures, uses, and sells underground locating devices that infringe a valid U.S. Patent No. 6,525,538 ("'538 patent") owned by Merlin and exclusively licensed to DCI.

RDC denies most of the allegations stated in Plaintiff's Complaint. In addition, RDC raises several affirmative defenses two of which are pertinent to the current motion. First, RDC alleges that it holds a valid license for manufacturing, use, and sale of products covered by '538 patent, which bars Plaintiffs from suing RDC for patent infringement. Second, RDC asserts that pursuant to a written agreement between RDC and DCI. Plaintiffs' patent infringement claim is subject to mandatory binding arbitration. The following facts sketch the parties' prior dealings highly relevant to the current dispute.

Prior to filing this suit, DCI brought its first patent infringement action against RDC in June of 1999, alleging that RDC infringed eight of DCI's patents. Two years later, DCI and RDC settled the matter and entered into an agreement pursuant to which RDC obtained a license to the patents that were subject to the settled action ("License Agreement").[1] The license agreement contains an arbitration clause which reads as follows:

> Except as otherwise provided in paragraphs 2.2.3 and 2.2.4 herein, any controversy or claim arising under or related to the interpretation of this License Agreement, including any issue as to the scope of this arbitration provision, shall be decided by arbitration before a single arbitrator selected by the parties.

(Def.'s Mot. to Stay Ex. A ¶ 9.2.)

Paragraphs 2.2.3 and 2.2.4 of the license agreement deal with payments of royalties. Each of those paragraphs is silent as to the manner of resolution of potential disputes between the parties. However, the agreement's paragraphs 2.2.7 and 2.2.8 expressly address the latter issue. Specifically, paragraph 2.2.7, which is pertinent to the current motion, lays out a procedure to which RDC must adhere to obtain a li-

---

1. The agreement defines those patents as "Patents–in–Suit." (Def.'s Mot. to Stay Ex. A at 1–2.)

cense to DCI's future related patents. It also provides a following mechanism for resolving disputes that might potentially arise in the course of that procedure:

> DCI shall notify RDC within thirty (30) days following the issuance of any LICENSED PATENT[2] other than the PATENTS–IN–SUIT, and such notice shall state which, in any, of RDC's then current products DCI believes are covered by the new LICENSED PATENT and which claims of the NEW LICENSED, if any, DCI believes cover each such product. Within thirty (30) days following RDC's receipt of said notice, RDC shall notify DCI of its election to pay royalties at the applicable rates above stated .... In the event RDC and DCI disagree whether a then current product is within the scope of the claims of any newly issued LICENSED PATENT or if RDC disputes whether the newly issued LICENSED PATENT is valid and enforceable, then RDC and DCI agree to negotiate in good faith to resolve the disagreement. If the disagreement has not been resolved within thirty (30) days following RDC's notice of its election to DCI, then DCI shall have the option of instituting a civil action to resolve any such dispute. If DCI does not institute a civil action between thirty (30) and thirty-five (35) days following RDC's notice of its election to DCI, RDC shall have the option of insti-

> tuting a civil action to resolve such dispute.... Alternatively, the parties may agree to submit, but shall not be required to submit, such a dispute to arbitration pursuant to the provisions of ARTICLE IX hereinbelow.

(Def.'s Mot. to Stay Ex. A ¶ 2.2.7.)

DCI alleges that it brought the instant action pursuant to paragraph 2.2.7 of the license agreement as a result of RDC's failure to pay royalties for '538 patent, which DCI obtained subsequent to the formation of the license agreement.[3] Accordingly, DCI argues that the plain language of paragraph 2.2.7 specifically authorizes it to seek a proper relief in court if RDC refuses to pay royalties for use of DCI's new patents covered by the license agreement. DCI further maintains that the above-quoted arbitration clause's cross-reference to the agreement's paragraphs 2.2.3 and 2.2.4 is an "obvious scrivener's error," and that the Court should reform the clause by replacing the cross-reference to paragraphs 2.2.3 and 2.2.4 with a cross-reference to paragraphs 2.2.7 and 2.2.8.[4] RDC counters that DCI's argument that disputes arising under paragraph 2.2.7 are exempted from arbitration is itself subject to arbitration because the arbitration clause by its own terms applies to the disputes as to its scope. In addition, RDC argues that DCI "has produced insufficient evidence to establish the existence of a mutual mistake requiring reformation of

2. The term "licensed patents," as used in the agreement, includes all "patents-in-suit" and "any division, continuation, reissue, or reexamination of any such patent." (Def.'s Mot. to Stay Ex. A ¶ 1.2.)

3. RDC admits that '538 patent "is a continuation of three of the PATENTS–IN–SUIT and is therefore LICENSED PATENT under the License Agreement." (Def.'s Mot. to Stay at 3 ¶ 7.)

4. DCI argues that, as evidenced by the language of the agreement's paragraph 2.2.7, the

parties genuinely intended that the "exception" part of the arbitration clause cross-reference to paragraphs 2.2.7 and 2.2.8 of the license agreement. In support of this argument, DCI submitted a copy of the agreement's original draft, which appears to be almost identical to the final version of the agreement with the exceptions that the draft contained no paragraphs 2.2.7 and 2.2.8 and that the text of the final agreement's paragraphs 2.2.7 and 2.2.8 appeared verbatim in paragraphs 2.2.3 and 2.2.4 of the original draft. (Keyt Decl. Ex. A at 5–6).

the License Agreement."[5] (Def.'s Reply at 2.) Having carefully reviewed the evidence submitted by the parties, the Court agrees with DCI and rules as follows.

## II. ANALYSIS

The Federal Arbitration Act ("FAA") directs federal courts to enforce otherwise valid arbitration agreements in commercial transactions. Specifically, section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, *upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement*, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (2000) (emphases added).

The FAA unequivocally places arbitration agreements in commercial transactions on the same footing with all other contracts. The Act provides:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law*

*or in equity for the revocation of any contract.*

9 U.S.C. § 2 (2000) (emphases added). As the United States Supreme Court has noted on several occasions, the above statutory language reflects "liberal federal policy favoring arbitration agreements." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (citations omitted). That policy, however, is implicated only if a valid arbitration agreement exists in the first place. As the Supreme Court explained:

> The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it 'does not require parties to arbitrate when they have not agreed to do so.' ... Because the FAA is 'at bottom a policy guaranteeing the enforcement of private contractual arrangements,' we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement.... While ambiguities in the language of the agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated.

*Id.* at 294, 122 S.Ct. 754 (internal citations omitted).

Consistent with the Supreme Court's interpretation of section 2 of the FAA, the Ninth Circuit has held that before a federal court orders the parties to proceed with arbitration, it must determine (1) whether a valid agreement to arbitrate exists, and (2) whether such agreement embraces the dispute at issue. *Chiron Corp. v. Ortho*

---

**5.** In addition, the parties engage in a lengthy debate as to whether DCI has exhausted all avenues provided for resolution of the current dispute by paragraph 2.2.7 of the license agreement. However, *it is not necessary for* the Court to reach that issue in ruling upon Defendant's current motion because, as shown below, the issue of arbitrability of Plaintiffs' patent infringement claim at bar does not depend upon Plaintiffs' exhaustion of contractual remedies.

*Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir.2000). Here, all parties admit existence of the agreement to arbitrate disputes generally arising out of the license agreement. The parties, however, sharply disagree on the issue of whether the license agreement's mandatory arbitration clause requires arbitration of the disputes arising under the agreement's paragraph 2.2.7. The Court therefore proceeds to determine whether DCI's instant claim for a patent infringement, based on RDC's alleged non-compliance with the licensing procedure prescribed by paragraph 2.2.7, is within the purview of the arbitration clause.

The facts of this case compel a two-step inquiry into the scope of the arbitration clause. Initially, the Court must determine whether the arbitration clause at hand should be reformed to contain a cross-reference to the agreement's paragraphs 2.2.7 and 2.2.8 instead of paragraphs 2.2.3 and 2.2.4. If that initial question is answered in the affirmative, the Court must resolve the issue of whether the disputes arising under the agreement's paragraph 2.2.7 are exempted from mandatory arbitration.

## A. Mutual Mistake And Reformation of The Arbitration Clause

■ DCI argues that the language of the arbitration clause in question runs con-

trary to the parties' intent to exempt the disputes arising under paragraph 2.2.7 of the license agreement from the mandatory arbitration requirement. The arbitration clause's cross-reference to paragraphs 2.2.3 and 2.2.4, DCI continues, is a result of a mutual mistake and "an obvious scrivener's error" in numbering of paragraphs, based on the fact that in the agreement's original draft paragraph 2.2.7 was numbered as 2.2.3. (Pls.' Opp'n at 9.) Accordingly, DCI requests that the Court reform the arbitration clause to comport with the parties' genuine intent as to limitations on its reach. RDC responds to DCI's "scrivener's error" argument by noting, in a cursory manner, that "DCI has produced insufficient evidence to establish the existence of a mutual mistake requiring reformation of the License Agreement." (Def.'s Reply at 2.)

■ To ascertain whether the parties have agreed to arbitrate DCI's current patent infringement claim, the Court should look to the applicable state law rules governing formation and validity of contracts. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Under the Minnesota law,[6] a court may reform a written contract if "(1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument

---

**6.** It is a well-established principle that if the laws of more than one state arguably apply to the claim or defense at issue, "a federal court exercising diversity jurisdiction must apply the conflict-of-laws-rules of the state in which the federal court is located." *Am. Triticale, Inc. v. Nytco Servs., Inc.,* 664 F.2d 1136, 1141 (9th Cir.1981) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). According to the Washington conflict-of-laws principle applicable in this case, "[a]n express choice of law clause in a contract will be given effect, as expressing the intent of the parties, so long as application of the chosen law does not

violate the fundamental public policy of the forum state." *McGill v. Hill,* 31 Wash.App. 542, 644 P.2d 680, 683 (1982). Here, the license agreement contains an express choice-of-law clause, which provides, in pertinent part, that "[the] Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota ...." (Def.'s Mot. to Stay Ex. A ¶ 9.1.) There is no evidence that construing the license agreement under Minnesota law voluntary chosen by the parties will offend Washington public policy. Therefore, the Court applies Minnesota law to determine whether the arbitration clause is enforceable as drafted.

failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 314 (Minn.2003) (citing *Nichols v. Shelard Nat'l Bank*, 294 N.W.2d 730, 734 (Minn. 1980)). Further, a party asserting a mutual mistake based on a scrivener's error must demonstrate by clear and convincing evidence that both parties agreed as to the content of the document and then somehow through a scrivener's error the document failed to reflect that agreement. *See id.*

■ The Court concludes that DCI has satisfied the burden of proving the parties' mutual mistake as to the arbitration clause's final language. The arbitration clause, by its own terms, applies to all disputes arising under the license agreement "except as otherwise provided in [the agreement's] paragraphs 2.2.3 and 2.2.4." (Def.'s Mot. to Stay Ex. A ¶ 9.2.) Careful examination of the agreement's paragraphs 2.2.3 and 2.2.4 reveals that neither of them contains even a slightest allusion to resolution of disputes. At the same time, paragraphs 2.2.7 and 2.2.8 describe the dispute resolution process in excruciating details. No other parts of the agreement deal with resolution of disputes.

Curiously, the parties had initially placed the language of paragraphs 2.2.7 and 2.2.8 of the license agreement in paragraphs 2.2.3 and 2.2.4 of the agreement's original draft. (*See* Keyt Decl. Ex. A at 5–6.) Otherwise, the content of the original draft is substantially similar to the license agreement's content. Importantly, the draft's arbitration clause is identical to the arbitration clause of the signed license agreement, namely it required arbitration of all disputes arising under the contract unless paragraphs 2.2.3 and 2.2.4 provided otherwise. In sum, a comparison of the agreement's signed version and the origi-nal draft demonstrates that at time of entering into the agreement the parties intended to limit application of the arbitration clause by the language initially placed in paragraphs 2.2.3 and 2.2.4, which was then moved to paragraphs 2.2.7 and 2.2.8, apparently as a result of the drafters' neglect. Based on the fact that no provision of the signed license agreement, other than 2.2.7, 2.2.8 and 9.2, discusses the dispute resolution process, any conclusion to the contrary would inevitably render the arbitration clause's cross-reference meaningless.

Having concluded that DCI and RDC genuinely agreed to limit the reach of the arbitration clause by the terms now appearing in paragraphs 2.2.7 and 2.2.8, and that due to a mutual mistake of the parties the arbitration clause failed to properly reflect that agreement, the Court hereby partially reforms the arbitration clause contained in paragraph 9.2 of the license agreement as follows:

> Except as otherwise provided in paragraphs 2.2.7 and 2.2.8 herein, any controversy or claim arising under or related to interpretation of this License Agreement, including any issue as to the scope of this arbitration provision, shall be decided by arbitration before a single arbitrator selected by the parties.

**B. Arbitrability of Disputes Arising Under Paragraph 2.2.7 of The License Agreement**

■ As shown above, the license agreement's arbitration clause mandates that DCI and RDC arbitrate all claims and controversies arising under the agreement unless the agreement's paragraphs 2.2.7 and 2.2.8 provide otherwise. Paragraph 2.2.7 confers upon either party to the agreement a right of initiating a civil action to resolve a dispute as to whether any new patent obtained by DCI covers the

products manufactured by RDC at that time. Paragraph 2.2.7 emphasizes that arbitration of such a dispute is merely optional: "[a]lternatively, the parties may agree to submit, *but shall not be required to submit,* such a dispute to arbitration pursuant to the provisions of Article IX below." (Def.'s Mot. to Stay Ex. A ¶ 2.2.7.) (emphases added). DCI's complaint alleges that RDC infringes certain claims of DCI's newly obtained '538 patent by manufacturing products that fall within the patent's scope. (*See* Pls.' Compl. ¶¶ 13–15.) DCI's patent infringement claim therefore belongs to a category of the disputes suitable for a judicial resolution pursuant to the license agreement's paragraph 2.2.7.

RDC argues that the issue of whether DCI has exhausted contractual remedies mandated by paragraph 2.2.7 before filing this suit is a matter "related to the interpretation and application of the License Agreement and [is] thus subject to arbitration." (Def.'s Reply at 2.) This argument implies no limitations on the reach of the agreement's arbitration clause. As such, it has no merit because the arbitration clause unequivocally distinguishes between claims related to DCI's newly issued patents that may arise under paragraph 2.2.7 and all other claims and controversies "arising under or related to the interpretation and application of [the] License Agreement." (Def.'s Mot. to Stay Ex. A ¶ 9.2.)

It is a well-established principle of a contract interpretation that specific contractual terms prevail over general terms. *See Burgi v. Eckes,* 354 N.W.2d 514, 519 (Minn.Ct.App.1984); *see also Restatement (Second) of Contracts* § 203(c) (1981). In addition, the Court should avoid an interpretation of the license agreement that would render any of the agreement's terms meaningless. *See Chergosky v. Crosstown Bell, Inc.,* 463 N.W.2d 522, 526 (Minn.1990).

Interpretation of the arbitration clause offered by RDC runs contrary to each of those canons. The license agreement's paragraph 2.2.7, dealing with the distinct issue of licensing the after-acquired patents, provides for a specific dispute resolution mechanism not affected by the agreement's general arbitration clause. This conclusion finds direct support in the language of the reformed arbitration clause itself, which expressly conditions an arbitrator's broad authority to adjudicate "any controversy or claim" upon the terms of paragraphs 2.2.7 and 2.2.8. Those paragraphs, in turn, make arbitration optional. Requiring DCI to arbitrate the issue of whether it has satisfied the prerequisites to initiating a civil action under paragraph 2.2.7 would, as a practical matter, significantly curtail DCI's choice to litigate patent infringement claims against RDC. The plain language of the arbitration clause and paragraph 2.2.7 guard against such interpretation of the interplay between those two provisions of the agreement.

In sum, the Court finds that DCI's current claim for patent infringement is exempted from mandatory arbitration by both the arbitration clause and the specific terms of the license agreement's paragraph 2.2.7.

## III. CONCLUSION

Based on the foregoing analysis, Defendant's motion to stay court proceedings and compel arbitration is hereby DENIED.