ALPHA REAL ESTATE COMPANY
OF ROCHESTER, Petitioner,
Appellant,

v.

DELTA DENTAL PLAN OF
MINNESOTA, et al.,
Respondents.

No. C7–01–2259.

Supreme Court of Minnesota.

July 3, 2003.

Timothy J. Hassett, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for Appellant.

David B Morse, Eagan, for Respondent.

OPINION

GILBERT, Justice.

This case involves interpretation of a lease entered into by appellant, Alpha Real Estate Company of Rochester, LLC, and respondent, Sui Generis Development Company. We must also determine the proper scope of review to apply to questions of law raised at the district court, where there was no motion for new trial pursuant to Minn. R. Civ. P. 59.01.

In 1995, Alpha Real Estate of Rochester, LLC (Alpha) entered into an agreement (1995 agreement) with respondent, Delta Dental Plan of Minnesota (Delta), providing that Alpha would lease a dental clinic from Delta's nominee, Sui Generis Development Company (Sui Generis). The 1995 agreement contains an additional rent clause stating that during the first 10 years of the lease Alpha would pay "five percent of adjusted cash receipts" in any year that cash receipts exceeded $1 million, and an option to purchase clause. In the event of purchase, the 1995 agreement provides that the five percent rental formula "shall continue for the remainder of the 10 year period." Sui Generis and Alpha subsequently entered into a lease with an option to purchase clause. The lease also contains a similar five percent additional rent clause, but does not provide that the five percent additional rent clause continues for the remainder of the 10–year period or survives the closing of the option. Subsequently, Alpha attempted to exercise the lease's option to purchase the property. Sui Generis refused to honor the option unless Alpha continued to pay the five percent additional rent after closing the option. Alpha then brought this action against Delta and Sui Generis seeking specific performance of the lease's option to purchase. Alpha also claimed that

the five percent additional rent clause violates federal and state law. The district court determined that the 1995 agreement and the lease must be construed together and, therefore, the five percent additional rent clause survives the closing of the option. The court also concluded that the five percent additional rent clause does not violate federal or state law. Using a narrow scope of review on the alleged error of law, the court of appeals affirmed. We reverse in part, affirm in part and remand to the court of appeals.

Delta Dental Plan of Minnesota is a Minnesota non-profit health-service-plan corporation that sells and administers dental benefit plans to businesses, governmental units, and labor unions. In early 1995, Michael Walsh, the President of Delta, approached Dr. Ted Erickson, a dentist from Faribault, to discuss opening a dental clinic in Rochester. Walsh proposed that Delta would purchase property in Rochester and build a dental clinic on the property. Erickson would then lease the property and provide dental services on a preferred basis to Delta clients. Delta's purpose in approaching Erickson was to address a lack of Delta providers in the Rochester area and to expand its provider network for its Delta Care product. Delta specifically needed a dental clinic in Rochester to service its IBM clients.

Negotiations between Erickson and Delta culminated in the execution of the 1995 agreement, dated August 4, 1995. The parties to the 1995 agreement are Alpha and Delta. Alpha was formed by Erickson and three other dentists from Faribault solely to lease the property. To operate the dental clinic, Erickson and the three dentists formed Apollo Dental Center, PLC (Apollo). Effective January 1, 1996, Apollo sub-leased the property from Alpha. Apollo is not a party to this action.

The 1995 agreement provides that Delta's nominee, Sui Generis, will purchase real estate in Rochester, construct a dental clinic on the property, and purchase equipment to furnish the clinic. In return, Alpha would lease the property from Sui Generis over a 20–year term and provide dental care on a preferred basis to persons covered under dental programs sold or serviced by Delta. Under the terms of the 1995 agreement, the monthly lease payments consist of Sui Generis' principal and interest loan payments plus a nominal administrative fee. In addition, the 1995 agreement contains a five percent additional rent clause:

> If in any one calendar year during the first ten years of the Lease (1996–2005) the adjusted cash receipts exceed $1 million, [Alpha] shall pay to Sui Generis additional rent for that particular year a sum equal to five percent of adjusted cash receipts.

Adjusted cash receipts are defined as "total cash receipts from patient service revenue."[1] The 1995 agreement states that the purpose of the five percent additional rent is to reimburse Delta for the risk it assumed under the 1995 agreement, and "as a partial contribution to defraying Delta's cost of marketing products in the Rochester area so as to provide a satisfactory volume of patients for the Rochester, Minnesota clinic." Under the 1995 agreement Alpha has the option of purchasing the property. Alpha's right to exercise the

---

1. Alpha does not generate any "adjusted cash receipts" because Alpha does not operate the clinic, and was formed solely to lease the property. Apollo generates professional fees, but is not party to the 1995 agreement or to the leases on this lawsuit. In its findings of fact the district court equated Alpha and Apollo and found "That Alpha provides dental services," and "That the first year Alpha achieved the targeted one million dollars of gross receipts triggering the five percent (5%) rental surcharge was for calendar year 1998."

option is contingent upon the execution of an agreement satisfactory to Delta "which provides for the continued servicing of Delta and its affiliates' patients on a preferred basis and the continued payment of the five percent rental surcharge."

Pursuant to the 1995 agreement, Sui Generis purchased property in Rochester and began construction on the dental clinic. In the fall of 1995, Sui Generis as landlord and Alpha as tenant executed a lease (1995 lease). The monthly lease payments under the 1995 lease are classified as "Basic Rent" and consist of the actual principal and interest payments for the financing obtained by Sui Generis for the cost of the property and improvements. The 1995 lease also contains an additional rent clause, which differs slightly from the additional rent clause in the 1995 agreement:

> Upon [Alpha's] achievement of Gross Receipts per calendar year of $1,000,000 ("Benchmark"), [Alpha] shall pay as Additional Rent an amount equal to five percent of all Gross Receipts ("Percentage Rent") for a period of ten successive years. "Gross Receipts" shall have the same meaning as "Adjusted Cash Receipts" as that term is defined in the [1995 agreement].

As in the 1995 agreement, the 1995 lease gives Alpha the option to purchase the property during the term of the lease.[2] The lease defines the option price as the remaining principal and interest due at the time the option is exercised plus any basic or additional rent due or past due. In contrast to the 1995 agreement, the 1995 lease does not contain a provision for the

continued payment of the five percent additional rent, or a survival clause. The lease does, however, provide that upon closing of the option the lease is cancelled and terminated and the parties are relieved from their obligations under the lease "accruing subsequent to closing." The 1995 lease also contains a merger clause.[3] Once construction of the clinic was completed, Sui Generis and Alpha executed a second lease (1997 lease) to adjust the monthly lease payments to reflect cost overruns and changes in financing. The 1997 lease contains five percent additional rent, merger, option, and lease termination clauses identical to those in the 1995 lease. The district court found that the 1995 agreement and the 1995 and 1997 leases were all prepared by Delta's attorneys. Apollo Dental Center opened a clinic on January 1, 1996 on the premises in issue.

In August 1999, pursuant to the 1997 lease, Alpha attempted to exercise its option to buy the property. Delta replied that it would not close on the option until Alpha provided written documentation stating that it would continue to pay the five percent additional rent and continue to service Delta's clients on a preferred basis after the option was closed. Delta also asserted that Alpha defaulted on both the 1997 lease and the 1995 agreement by failing to pay $57,418.30 in additional rent for 1998, $86,741 in additional rent for 1999, and failing to provide financial statements.

Alpha brought this action against Delta and Sui Generis (collectively Delta) seeking specific performance of the 1997 lease option. Delta answered, claiming that the

---

**2.** The lease provided: "Exercise may only be made by Tenant strictly in accordance with the terms and conditions herein."

**3.** "All preliminary and contemporaneous negotiations are merged into and incorporated in this Lease Agreement. This Lease Agree-

ment contains the entire agreement between the parties and shall not be modified or amended in any manner except by an instrument in writing executed by the parties hereto."

1995 agreement is an integral part of the 1997 lease and that Alpha's attempt to exercise the option did not comply with the 1995 agreement or the 1997 lease. Delta also counterclaimed, claiming that under the terms of the 1997 lease and the 1995 agreement, Alpha owed the five percent additional rent for 1998 and 1999. Alpha then moved for partial summary judgment seeking declaratory relief as to the rights and obligations of the parties under the 1997 lease and specific performance of the option to purchase. Alpha asserted that the 1997 lease, by its terms, is the final agreement of the parties and under the 1997 lease the five percent additional rent clause does not survive the closing of the option. Alpha also argued that the five percent additional rent clause violates state and federal law prohibiting kickbacks for dental service referrals.[4] The district court denied Alpha's motion for summary judgment and specific performance, concluding that the intent of the parties as to whether the five percent additional rent survives the option to purchase is unclear.

The case proceeded to a bench trial in June 2001. The district court engaged in what it termed "the practical construction of the Agreements evidenced by the conduct of the parties" and concluded that the parties intended that "the five percent rent provision would survive for the balance of the first ten years of the Lease (1996–2005) in the event of the exercise of the option to purchase." The court then concluded that Alpha breached the 1995 agreement and the 1997 lease with Delta. The court reasoned that the 1997 lease was not fully integrated and that the parties intended the 1997 lease to be read in conjunction with the 1995 agreement. Therefore, the court construed the 1995 agreement and the 1997 lease together. It

reasoned that, "the absence of language regarding the five percent surcharge from the 1997 Lease was the result of an error; the absence of language regarding the five percent surcharge did not reflect the intent of either party. It was not negotiated." Thus, the court concluded that Alpha breached the 1995 agreement and the 1997 lease and that the five percent additional rent clause survives the closing of the option to purchase. The court also concluded that the five percent additional rent clause does not violate state or federal statutes and that Delta is entitled to collect from Alpha $165,500.81, under the five percent additional rent clause, for 1998 and 1999. Using a narrow standard of review, the court of appeals affirmed.

We granted Alpha's petition for review. We are asked to determine whether (1) the court of appeals applied the proper scope of review; (2) the five percent additional rent clause survives the closing of the option to purchase; and (3) the five percent additional rent clause violates federal or state antikickback statutes.

## I.

We first address the proper scope of appellate review under these facts. Following the bench trial, Alpha did not move for a new trial pursuant to Minn. R. Civ. P. 59.01 but instead appealed directly to the court of appeals. At the court of appeals, Alpha argued that the district court erred in using extrinsic evidence to interpret the 1997 lease and in finding that the five percent additional rent clause did not violate federal and state antikickback statutes. Because Alpha had failed to move for a new trial, the court of appeals applied a narrow scope of review to these issues: "whether the evidence sustains the findings of fact and whether such findings

---

4. *See* 42 U.S.C. § 1320a–7b(b)—7b(f) (2000) and related statutes and regulations; Minn. Stat. § 62J.23, subd. 1 (2002) and Minn.Stat. § 150A.11, subd. 4 (2002).

sustain the conclusion of law and the judgment." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, No. C7-01-2259, 2002 WL 1840897, at *4 (Minn.App. Aug.13, 2002) (quoting *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976)). Alpha asserts that the court of appeals impermissibly restricted the scope of review and that we should give full de novo review to the contractual and statutory interpretation issues.

In limiting the scope of review, the court of appeals reasoned that generally a motion for a new trial is a prerequisite to appellate review and if a motion for a new trial is not made, appellate review is limited to the *Gruenhagen* scope of review. *Alpha Real Estate*, 2002 WL 1840897, at *4 (citing *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn.1986)). The court of appeals then noted that in previous cases it applied a "question of law" exception to this rule. But, in light of this court's reasoning in *Tyroll v. Private Label Chems., Inc.*, 505 N.W.2d 54, 57 (Minn. 1993), the court of appeals concluded that the question of law exception is not a legitimate exception and refused to apply it to the present case. The court reasoned that *Tyroll* distinguishes *sui generis* rights, which are reviewable, from routine questions of law, which are not reviewable. Thus, the court concluded that because Alpha's contractual and statutory interpretation issues did not involve *sui generis* rights, and because Alpha failed to move for a new trial, its review was limited to the *Gruenhagen* scope of review.

In *Sauter*, we reestablished our longstanding rule "that matters such as trial procedure, evidentiary rulings and jury instructions are subject to appellate review only if there has been a motion for a new trial in which such matters have been assigned as error." 389 N.W.2d at 201. The benefits of requiring motions for a new trial are twofold: (1) they may eliminate the need for appellate review; or (2) if appellate review is sought, they facilitate development of "critical aspects of the record." *Id.* More specifically, motions for a new trial "focus the [district] court's attention on the specifics of an objection"; give the district court the time "and the opportunity to consider the context in which the alleged error occurred and the effect it might have had upon the outcome of the litigation"; and provide the district court with the opportunity to correct its own errors. *Id.* at 201–202.

In *Tyroll*, we clarified the *Sauter* rule. *Tyroll* involved an employer's subrogation claim where the district court ruled against the defendant tortfeasor. 505 N.W.2d at 56. Arguing that he was entitled to a jury trial, the defendant appealed directly to the court of appeals without first moving for a new trial. *Id.* The court of appeals determined that questions of law are reviewable by an appellate court despite the appellant's failure to move for a new trial. *Id.* The court of appeals then determined that the jury trial issue was a question of law, reviewed the issue and held that the district court erred in denying the defendant a new trial. *Id.*

Considering whether the jury trial issue was properly reserved for appellate review, we first reiterated the *Sauter* rule: "matters such as trial procedure, evidentiary rulings and jury instructions are subject to appellate review only if there has been a motion for a new trial in which such matters have been assigned as error." *Tyroll*, 505 N.W.2d at 56 (quoting *Sauter*, 389 N.W.2d at 201). Next, we addressed the question of law exception applied by the court of appeals. Reasoning that, with ingenuity, most issues can be converted into questions of law, we warned, "if the [question of law] exception were to be

allowed, it would soon swallow up *Sauter.*" *Id.* at 57. Thus, we concluded that the question of law exception is incompatible with our well-established case law. *Id.* Turning to the issue of whether *Sauter* barred appellate review of the jury trial issue, we stated that the "threshold issue" is whether the contested issue is a matter of trial procedure. *Id.* Applying this standard, we reasoned that the right to a jury trial is more than procedural; it is also *sui generis* because "it defines the basic nature of the decisionmaking process itself." *Id.* Thus, we reviewed the jury trial issue. *Id.*

■ Alpha argues the court of appeals misconstrued *Tyroll.* We agree and conclude that *Tyroll* does not stand for the proposition that we will review non *sui generis* questions of law only when the appellant has made a motion for a new trial. In this instance, the questions of law at issue before us were fully briefed and argued at the district court in the summary judgment memoranda and post-trial prejudgment briefs. While we did reject a broad question of law exception in *Tyroll,* we nevertheless reviewed the issue of whether the defendant was entitled to a jury trial. Our warning that "[w]ith a little ingenuity, most questions can be converted into so-called 'questions of law' " was directed at the practice of attempting to convert procedural, evidentiary, and jury instruction issues into questions of law. *Id.* Thus, we conclude that the *Sauter* rule does not apply to substantive questions of law that were properly raised during trial.[5] Any holding to the contrary would be akin to requiring a motion for reconsideration of all rulings before the

appellate courts could properly address substantive questions of law.

■ Moreover, we have consistently enunciated the *Sauter* rule in terms of "trial procedure, evidentiary rulings and jury instructions." *Tyroll,* 505 N.W.2d at 56 (quoting *Sauter,* 389 N.W.2d at 201); *see also, Heise v. J.R. Clark Co.,* 245 Minn. 179, 191, 71 N.W.2d 818, 826 (1955). We have classified matters such as trial procedure, evidentiary rulings and jury instruction as "issues arising during the course of trial." *Sauter,* 389 N.W.2d at 202. The motion for a new trial aids the district court in reconsidering objections to issues that arose during trial. When objections are made during the course of trial, the court must make quick, on-the-spot decisions. The motion for a new trial gives the court time to consider the context of the objection and the effect the error may have had on the outcome of the case. This permits the court to more fully develop the record for appellate review or to correct its own mistake and alleviate the need for appellate review. Moreover, we give deference to the court's decisions regarding such matters that arise during the course of trial. *Hilligoss v. Cargill, Inc.,* 649 N.W.2d 142, 147 (Minn.2002) (stating that district courts have broad discretion in determining jury instructions); *Gross v. Victoria Station Farms, Inc.,* 578 N.W.2d 757, 760–61 (Minn.1998) (stating that the district court has "considerable" discretion in determining whether to admit an expert opinion). Thus, a general demarcation line can be drawn as to when post-trial motions are required for assignments of error relating to the conduct of the trial that reside within the district courts' discretion and substantive questions of law.

---

**5.** Black's Law Dictionary defines substantive law as "The part of the law that creates, defines, and regulates the rights, duties, and powers of parties." *Blacks Law Dictionary* 1443 (7th ed.1999). In contrast, procedural law is defined as "The rules that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves." *Id.* at 1221.

In contrast to matters arising during the course of trial, we do not give deference to the district court's conclusions of law and we review questions of law de novo. *Kornberg v. Kornberg,* 542 N.W.2d 379, 384 (Minn.1996); *Boldt v. Roth,* 618 N.W.2d 393, 396 (Minn.2000). Here, Alpha raises two such issues on appeal: (1) whether the 1997 lease was fully integrated; and (2) whether the five percent additional rent clause violates federal or state law. This is not the situation we expressed concern about in *Tyroll.* Alpha is not ingeniously converting a procedural issue into a question of law. In addition, the policy reasons supporting our *Sauter* decision are not implicated here. One purpose for requiring post-trial motions is to flesh out the reasoning behind a district court's ruling. Alpha raised the two issues twice during the course of trial, in a pretrial summary judgment motion and in a post-trial, prejudgment brief. Thus, the district court had ample opportunity to consider these issues and did not need more time to flesh out or refine its reasoning. Moreover, a new trial would not alter the court's conclusions of law; there is no evidence to exclude, no erroneous jury instructions to correct, and no trial procedures to alter. For the above reasons, we conclude that, while permissive, motions for a new trial pursuant to Minn. R. Civ. P. 59.01 are not a prerequisite for appellate review of substantive questions of law when a genuine issue of law is properly raised and considered at the district court level. Accordingly, we hold that the court of appeals erred in using the *Gruenhagen* scope of review.

## II.

We next consider whether the five percent additional rent obligation survives the closing of the option. This issue involves the interpretation of a written contract, which is a question of law. *Art Goe-*bel, Inc. v. N. Suburban Agencies, Inc.,* 567 N.W.2d 511, 515 (Minn.1997). We review questions of law de novo. *Boldt,* 618 N.W.2d at 396.

The district court concluded that the five percent additional rent clause survives the closing of the option. Considering extrinsic evidence, the court concluded that the lease was ambiguous and that the parties intended their relationship to be governed by the terms of the 1995 agreement in conjunction with the 1997 lease. Reviewing the circumstances surrounding the negotiations of the 1995 agreement and the 1997 lease, the court found that the absence of language in the 1997 lease regarding the survival of the five percent additional rent after the closing of the option was the result of "scrivner's [sic] error," "mutual mistake," or "an oversight," and that neither party intended to alter the language of the 1995 agreement. Therefore, the court concluded that the five percent additional rent, as represented in the 1995 agreement, survives the closing of the option to purchase.

The court of appeals affirmed the district court, stating that it was using the *Gruenhagen* scope of review. However, the court of appeals concluded that the district court erred in finding that the facts and circumstances of the case revealed an ambiguity in the 1997 lease and in finding the existence of mutual mistake or a scrivener's error. The court of appeals then affirmed the district court on an alternative ground; it concluded that the district court was justified in using extrinsic evidence to determine whether the 1997 lease was fully integrated. The court of appeals held that the 1997 lease was not fully integrated and that the district court did not err in allowing parol evidence from the 1995 agreement to prove the contents of the survival clause. Even though the court of appeals purported to use the *Gru-*

*enhagen* scope of review, it actually reviewed the contractual interpretation issue de novo. Because the court of appeals has already reviewed this issue de novo, a remand is inappropriate and we will review the issue.

■ Alpha argues that the 1997 lease is a complete integration and, therefore, extrinsic evidence [the terms of the 1995 agreement], cannot be used to supplement the terms of the 1997 lease. In response, Delta contends that the parties intended to have their relationship governed by both the 1995 agreement and the 1997 lease. The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." Richard A. Lord, Williston on Contracts § 33:1 (4th ed.1999). Accordingly, "when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." *Hruska v. Chandler Assoc's., Inc.*, 372 N.W.2d 709, 713 (Minn.1985).

■ However, "where a written agreement is ambiguous or incomplete, evidence of oral agreements tending to establish the intent of the parties is admissible." *Gutierrez v. Red River Distrib., Inc.*, 523 N.W.2d 907, 908 (Minn.1994) (quoting *Material Movers, Inc. v. Hill*, 316 N.W.2d 13, 17 (Minn.1982)). If it appears from the circumstances surrounding the case that the parties did not intend the agreement to be a complete integration, then parol evidence can be used to prove the existence of a separate consistent oral agreement. *Bussard v. Coll. of St. Thomas, Inc.*, 294 Minn. 215, 224, 200 N.W.2d 155, 161 (1972) (citing *Phoenix Publ'g Co. v. Riverside Clothing Co.*, 54 Minn. 205, 206, 55 N.W. 912 (1893)). We articulated the following rule to determine whether a contract is a complete integration:

> A determination of whether the written document is a complete and accurate "integration" of the terms of the contract is not made solely by an inspection of the writing itself, important as that is, for the writing must be read in light of the situation of the parties, the subject matter and purposes of the transaction, and like attendant circumstances.

*Bussard*, 294 Minn. at 224, 200 N.W.2d at 161.

Although *Bussard* states the writing "must be read in light of the situation of the parties, the subject matter and purposes of the transaction, and like attendant circumstances," *Bussard* did not involve an agreement that included a merger clause. A merger clause establishes that the parties intended the writing to be an integration of their agreement. Richard A. Lord, Williston on Contracts § 33:21 (4th ed.1999). In some jurisdictions a merger clause is "conclusive evidence of the parties' intent to consider the agreement integrated." [6] *Id.*

---

6. *See e.g., Crown Pontiac, Inc. v. McCarrell*, 695 So.2d 615, 618 (Ala.1997) ("[W]e hold that the merger clause in the second retail buyer's order form bars the enforcement of any previous agreements of the parties and makes the final retail buyer's order form the final contract of the parties."); *Nelson v. Elway*, 908 P.2d 102, 107 (Colo.1996) (holding that "merger clauses preclude consideration of extrinsic evidence to ascertain the intent of the parties"); *Brown v. Grow*, 249 Mass. 495, 144 N.E. 403, 404 (1924) ("[W]hen in a written contract is a stipulation that the contract recites all the inducements to its execution, that no representation not embodied therein shall be binding and no agent has power to modify or waive any of its terms, evidence extraneous and contradictory to its terms is not admissible.").

■ Here, the 1997 lease contains a merger clause:

All preliminary and contemporaneous negotiations are merged into and incorporated in this Lease Agreement. This Lease Agreement contains the entire agreement between the parties and shall not be modified or amended in any manner except by an instrument in writing executed by the parties hereto.

This merger clause specifically states that it is the "entire agreement between the parties." As the district court found, "the 1997 lease is a 54–page, comprehensive agreement which, by its terms, contains the entire agreement between the parties." Thus, under these facts, we need not look beyond the writing of the 1997 lease itself to determine whether it is a complete integration.

Although the district court found that the 1997 lease contained the entire agreement of the parties, it engaged in a practical construction of the 1995 agreement to modify the terms of the 1997 lease. We agree that the 1997 lease is a comprehensive agreement that contains the entire agreement of the parties, but we also conclude that the district court erred in construing the 1997 lease and the 1995 agreement together. While there is a reference to the 1995 agreement in the 1997 lease, it is solely limited to providing a definition of "adjusted cash receipts." There is no reference in the 1997 lease to other terms of the 1995 agreement or any provision for the continuance of the five percent additional rent payments after purchase. Moreover, *Bussard* instructs that if the additional agreement is one that similarly situated parties would include in the written agreement, then the written agreement is complete. *Bussard*, 294 Minn. at 226, 200 N.W.2d at 162. The survival of the additional rent obligation after purchase is certainly important enough that

the parties would have included it in the 1997 lease if it were intended to survive after a purchase by Alpha.

In its analysis, the court of appeals did not address the 1997 lease merger clause, or the fact that the district court found that the 1997 lease "contains the entire agreement between the parties." It simply held that "the parties entered into several agreements, all of which must be read in light of the others." *Alpha Real Estate*, 2002 WL 1840897, at *7. In reasoning that the 1995 agreement and the 1997 lease must be construed together, the court of appeals relied on *Anchor Cas. Co. v. Bird Island Produce, Inc.*, 249 Minn. 137, 82 N.W.2d 48 (1957). In *Anchor Casualty*, we stated that, "It is well established that where contracts relating to the same transaction are put into several instruments they will be read together and each will be construed with reference to the other." *Id.* at 146, 82 N.W.2d at 54. Here, although the 1995 agreement and the 1995 and 1997 leases involve the same property, they differ and were entered into successively and not contemporaneously. Furthermore, the 1997 lease replaced both the prior lease and the 1995 agreement and represented the new and entire agreement of the parties. Therefore, the rule articulated in *Anchor Casualty* is not applicable here.

The court of appeals then affirmed the district court's use of extrinsic evidence to determine whether the 1997 lease was fully integrated and concluded, "that the survival clause remained in effect after the execution of the 1997 lease." The court of appeals found that the survival clause from the 1995 agreement was "a consistent additional term." While we do not need to reach this issue because we conclude that the 1997 lease is a complete integration, contrary to what the court of appeals held, the survival clause is in fact inconsistent

with the terms of the 1997 lease. The 1997 lease provides that upon the closing of the option the parties are relieved of their lease obligations. The survival clause providing for the continuation of the additional five percent rent obligation after the closing of the option contradicts the clear language of the lease relieving the parties from their lease obligations upon the closing of the option to purchase.

Finally, we affirm the court of appeals on the grounds stated herein, that this was not an appropriate case for reformation of a contract. The district court erred when it found that the absence of language in the 1997 lease regarding the survival of the five percent additional rent after the closing of the option was a result of mutual mistake or scrivener's error. The district court reasoned that because the parties did not negotiate a change to the five percent additional rent provision in the 1995 or 1997 lease, "The change was made by mistake, inadvertence, or a scrivener's [sic] error." Thus, on the basis of mutual mistake and scrivener's error, the district court essentially reformed the 1997 lease to include the survival of the five percent additional rent clause. Reformation is appropriate when

(1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties.

*Nichols v. Shelard Nat'l Bank,* 294 N.W.2d 730, 734 (Minn.1980). To demonstrate mutual mistake based on scrivener's error, "it is necessary that both parties agree as to the content of the document but that somehow through a scrivener's error the document does not reflect that agreement." *Id.* Here, there is no evidence of a

drafting error; nor is there evidence of mutual mistake, fraud, misrepresentation or inequitable conduct. Reformation was not an appropriate remedy. Moreover, as found by the district court, the 1997 lease was drafted by Delta's counsel. Even if there were an ambiguity in the 1997 lease, any such ambiguity would be construed against the party who drafted it. *Hilligoss,* 649 N.W.2d at 149.

We conclude that the 1997 lease is a complete integration and represents the complete and exclusive statement of the terms of the agreement between the parties and is unambiguous. Therefore, it was error to consider extrinsic evidence, such as the conduct of the parties, and the terms of the 1995 agreement, to reform or modify the terms of the 1997 lease.

We next consider Alpha's contention that under the 1997 lease the five percent additional rent obligation terminates when Alpha exercises its option to purchase. As found by the district court, neither the 1995 nor the 1997 lease provided for the extension of the five percent additional rent upon exercise of the option to purchase the property.[7] We hold that under the 1997 lease Alpha's five percent additional rent obligation terminates upon the closing of the option to purchase and reverse the court of appeals.

### III.

Although we have determined that the five percent additional rent does not survive the closing of the option, the issue of whether the five percent additional rent violates state and federal law must still be determined because the district court ordered Alpha to pay Delta $165,500.81 in additional rent for 1998 and 1999. In considering this issue, the court of appeals

---

7. Delta does not contend that under the 1997 lease the additional rent clause survives the closing of the option and they specifically accept the district court's findings of fact.

erroneously applied the *Gruenhagen* scope of review. Therefore, we remand the issue to the court of appeals to review de novo whether the five percent additional rent clause violates federal and state law.

Reversed in part, affirmed in part and remanded.