*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0489**

In the Matter of the Welfare of the Child of: B. D. D. and D. A. A., Parents.

**Filed August 26, 2024
Affirmed; motion denied
Wheelock, Judge**

Otter Tail County District Court
File No. 56-JV-22-2425

Mallory K. Stoll, Blahnik, Prchal & Stoll, PLLC, Prior Lake, Minnesota (for appellant D.A.A.)

Michelle Eldien, Otter Tail County Attorney, Kathleen J. Schur, Assistant County Attorney, Fergus Falls, Minnesota (for respondent Otter Tail County Department of Human Services)

Matthew C. Porter, Fergus Falls, Minnesota (for child)

Anahita Halvorson, Fergus Falls, Minnesota (guardian ad litem)

Considered and decided by Reyes, Presiding Judge; Wheelock, Judge; and Florey, Judge.[*]

**NONPRECEDENTIAL OPINION**

**WHEELOCK**, Judge

In this appeal from the district court's termination of his parental rights, appellant father (1) argues that the district court did not have subject matter jurisdiction to terminate

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

his parental rights and (2) moves to amend the scope of the appeal. Because the district court satisfied the statutory requirements to modify jurisdiction, we affirm the district court's order and judgment terminating father's parental rights. And because father did not raise any of his other arguments to the district court and the time to do so has passed, we deny father's motion to amend the scope of the appeal.

**FACTS**

In January 2010, B.D.D., mother, gave birth to a child in Florida. In March 2021, in the only Florida court order related to the child prior to her relocation to Minnesota, the Florida district court declared that appellant D.A.A. was the child's father and granted the parents joint legal and joint physical custody of the child.

*Florida's Contact with the Child, Mother, and Father*

Florida child protection was involved with the child throughout her life because of numerous incidents, including the following:

- In March 2011, mother admitted that she brought the child with her to purchase drugs and that the person she met attempted to rob her during the sale.

- In July 2012, father punched his paramour in the mouth during a sexual encounter and was arrested for battery in the child's presence.

- In January 2013, father pushed mother in the face while holding the child and was arrested for domestic violence.

- In August 2014, father discovered that mother was using heroin, so he took the child from mother's care. Although the child-protection investigator did not see track marks and mother did not test positive for any nonprescription drugs, the investigator's report stated

2

that the child told the investigator that "she has seen her mom taking her medication by putting a tampon holder to her nose and snorting it." The child then demonstrated that act for the investigator.

- In February 2016, mother attempted to take the child from father after learning that father was too intoxicated to care for the child. Father began pushing mother to keep her from taking the child, then father battered mother's paramour and was arrested. The incident occurred in front of the child.

- In 2016, father slapped the child while he was under the influence of alcohol.

- In May 2017, father had been drinking and got into an argument with mother during which he threw a box fan at mother. The child witnessed the altercation.

- In January 2020, mother locked the child in her room and gave her a pot to use as a toilet. Reports indicate that this happened multiple times.

In later reports, investigators stated, "The family has an extensive history with the department that portrays a significant pattern of family violence and substance misuse. There are multiple verified reports . . . ."

In 2020, father moved to Montana to participate in a chemical-dependency treatment program, during which time he continued to have contact with the child. Father returned to Florida at some point, and in 2021, the State of Florida filed a criminal charge against him, but father moved to Minnesota for a temporary job in October 2021. On November 24, 2021, mother battered the child and fled the scene, abandoning the child, and law enforcement issued a warrant for her arrest. This is the last day that it is certain

the child lived in Florida because father then retrieved the child from Florida and brought her to live with him in Minnesota.

*Minnesota's Contact with the Child and Father*

In January 2022, less than three months after the child moved to Minnesota with father, respondent Otter Tail County Department of Human Services (the county) became involved with the child. The county received a report that, while the child was with her friends, father began yelling at her and brought her into another room, where she threw up. Witnesses reported that father was "verbally abusing [the child], screaming in her face and had her in the corner crying and shaking in fear." Witnesses reported that father forced the child to take off her sweatshirt, which revealed slits on her arms, and he "proclaimed that . . . he was taking her to a 'God d-mn shrink' because she is 'f-cked up in the head.'"

On March 22, 2022, the county removed the child from her father after his landlord informed police that he witnessed father threatening and screaming at the child. The child told the officers that father held her face-down on the floor and lay on top of her, slapping the back of her head and yelling, "F-ck you, get out of my life." She "reported being scared and 'triggered' due to past trauma." Officers observed that father had "watery, bloodshot eyes and smell[ed] of alcohol," and the State of Minnesota charged father with gross-misdemeanor domestic assault. The child was immediately placed in protective care.

On March 24, 2022, the county initiated a child-in-need-of-protection-or-services (CHIPS) proceeding, and in June 2022, the district court adjudicated the child as CHIPS and adopted an out-of-home placement plan. The plan required father to complete a chemical-dependency evaluation and an anger-management assessment and follow all

4

recommendations, submit to random drug testing, participate in intensive in-home therapy with the child, comply with probation, and remain law abiding. At the June hearing, father requested that the child be returned to him immediately, but the district court denied the request because father had tested positive for cocaine, failed to complete domestic-violence classes as recommended, and failed to comply with the recommendations of the chemical-dependency evaluation.

Father has an extensive criminal history. Prior to moving to Minnesota, from 2008 through 2021, father had seven criminal charges or convictions in Florida that included multiple counts of battery and substance-related offenses involving cocaine, marijuana, and alcohol. During the short time father was in Minnesota before the CHIPS proceedings began, the State of Minnesota filed three criminal complaints against father: two gross-misdemeanor counts of driving while intoxicated in 2021 and one felony count of driving while intoxicated in March 2022. The state filed its fourth criminal complaint against father in July 2022, charging father with felony driving while intoxicated with the child in the car. Father violated the terms of his conditional release for the latter offense by testing positive for cocaine and failing to appear at a hearing on the violation, which led to the district court issuing a warrant for his arrest.

Pursuant to this warrant, father was arrested in North Dakota at the start of September 2022, but he fled to Montana and was arrested the next day by Montana law enforcement on charges in that state of felony driving while intoxicated, driving with a suspended license, failing to notify after an accident, fleeing the scene, fleeing a peace officer, and obstructing justice. The State of Minnesota also charged him with being a

5

fugitive. The county subsequently reported that father "has made no progress on his case plan and has instead continued to accumulate new criminal charges in multiple Minnesota counties, as well as in Montana." The State of Montana stayed father's sentences and sent him to intensive, long-term chemical-dependency treatment through the Montana Department of Corrections, where he stayed for the remainder of these proceedings.

Mother evaded law enforcement throughout this time and still had an active warrant in Florida for her assault of the child in November 2021. She was eventually diagnosed with severe opioid use, and in late 2022, she entered inpatient chemical-dependency treatment. Mother completed treatment and moved into an outpatient sober-living facility in February 2023.

*County's Petition for Involuntary Termination of Parental Rights*

In October 2022, the county filed a petition for involuntary termination of parental rights (TPR) as to both parents pursuant to Minn. Stat. § 260C.301, subds. 1(b)(1)-(2), (4)-(5), (8) (2022), for abandonment, refusal to perform or neglect of parental duties, unfit parent, failure of reasonable efforts at reunification, and neglect of the child who is now in foster care. Father petitioned to place the child with his parents in Montana, which the district court granted.

In December 2022, the district court held an admit/deny hearing, and the guardian ad litem (GAL) submitted a report recommending that custody remain with the county and relatives due to father's criminal history, encounters with child welfare in Florida, substance abuse, episodes of driving under the influence, and alleged domestic violence against the child. Both parents denied the petition, and the district court set the matter for

6

trial in February 2023. Around this time, the county moved the district court to take judicial notice of the underlying CHIPS file and the various Minnesota criminal proceedings involving father.[1] The county did not include any part of the CHIPS file with its motion, however, and the district court did not identify of which parts of the CHIPS proceedings it would take judicial notice when it granted the county's motion.[2]

On February 21, 2023, father submitted an affidavit of consent to voluntarily terminate his parental rights.

*TPR Trial*

The district court held the trial on the TPR petition on February 27 and 28. The GAL submitted a report recommending that the child be placed out of the home permanently. While acknowledging that the child wanted to be reunited with her father, the report stated that the child had not received sufficient mental-health support while in

---

[1] We note that the Minnesota Rules of Juvenile Protection Procedure do not permit a district court to take notice of an entire file. *See* Minn. R. Juv. Prot. P. 302, subd. 3.

[2] Father argues in his brief to this court that the district court did not have subject matter jurisdiction over the CHIPS proceedings; however, this issue is not properly before this court. Because father did not appeal the order from the CHIPS proceedings, it is an impermissible collateral attack. *See State v. Romine*, 757 N.W.2d 884, 889-90 (Minn. App. 2008) ("As a general rule, a party's failure to appeal the issuance of a court order precludes a collateral attack on that order in a subsequent proceeding."), *rev. denied* (Minn. Feb. 17, 2009); *see also Dieseth v. Calder Mfg. Co.*, 147 N.W.2d 100, 103 (Minn. 1966) (stating, in a civil case, that "[e]ven though the decision of the trial court in the first order may have been wrong, if it is an appealable order it is still final after the time for appeal has expired"); *In re Welfare of Child of B.G.*, No. A16-1512, 2017 WL 958476, at *4 (Minn. App. Mar. 13, 2017) ("Because the time for appealing the CHIPS order has expired, that order is final, and challenges to that order amount to an improper collateral attack on that ruling."); Minn. R. Civ. App. P. 136.01(c) ("Nonprecedential opinions . . . may be cited as persuasive authority."). Therefore, we do not consider father's arguments with respect to the CHIPS proceedings.

Montana with her grandparents and that, after "a mental health incident in school," the child was taken to the emergency department. By the start of trial, the grandparents had informed the county that they could not be a permanent placement for the child given her significant mental-health needs.

The district court began the first day of trial, February 27, with a discussion of subject matter jurisdiction. All prior district court orders in this matter included a legal determination that the district court had jurisdiction, but the district court discovered that subject matter jurisdiction was an issue prior to starting the trial. The county argued that it "had been in contact with Florida throughout these proceedings, and there was no child protection action there at that time," and thus, the district court had subject matter jurisdiction. And it asserted that the child had significant connections to Minnesota because the child was attending school in Minnesota, father and the child rented housing here, and father had a significant other with whom he lived in Detroit Lakes after the county proceeded with out-of-home placement for the child. Father argued that he never intended to remain in Minnesota because he procured only temporary employment here and that he intended to move with the child to Montana. Father stated that, if the Florida court decided to exercise jurisdiction, "his admission or consent to the voluntary termination would be in effect null and void."

The district court determined that the Florida court had to relinquish jurisdiction before it could exercise jurisdiction. Because it could take some time to obtain a response from the Florida court and the parties and several participants were prepared to move forward that day, the district court decided to proceed. The district court received

testimony and took the matter under advisement until the issue of jurisdiction could be resolved.

During the remainder of the trial, father testified in support of his affidavit to voluntarily terminate his parental rights.[3] The county elicited testimony that father consented to the termination, understood the proceedings, understood his rights, had spoken with his attorney, and reviewed and signed the written consent form. Father agreed that terminating his rights was in the child's best interests, explaining that "by entering the voluntary termination I would still have potential access to my daughter to be able to play a significant role in her life and to have visitation and things of that manner."

The GAL testified that it was in the best interests of the child that father's parental rights be terminated. The district court's order explained that, although the GAL acknowledged that father and the child have a "significant bond," the GAL expressed concern about father's alleged domestic abuse of the child in Minnesota and Florida, his ongoing chemical dependency and criminal matters, and the possibility of a "significant prison sentence" if he fails to comply with the terms of his stayed sentence.

*Florida District Court Conference*

The next day, February 28, the district court conducted a video conference with Judge Healey, the Florida district court judge who signed the March 2021 order establishing paternity and shared custody of the child between mother and father. At the

---

[3] Mother also voluntarily terminated her parental rights at this proceeding, and the district court determined that the county elicited the testimony necessary to support the voluntary termination.

9

start of the proceedings, father's Minnesota attorney stated that father had acquired a Florida attorney, but that, due to the short notice, the Florida attorney could not attend the conference. Father told the court that he maintained an address in Florida and would like the Florida attorney to be present because the matter involves Florida law. The district court stated that father's Florida attorney had not filed any notice with the Minnesota district court to indicate that he intended to appear, that Judge Healey could provide insight on and explanations of Florida law, and that father was still represented by an attorney at the conference because his Minnesota attorney was present.

Judge Healey confirmed that the Florida case had been closed since the March 2021 order was signed and that Florida "would be in a position to relinquish jurisdiction to Minnesota, given that the child is there and has been there for quite some time." Judge Healey also stated, "I think the home state probably is Minnesota; and, two, it seems like the more convenient forum is Minnesota; and, three, you're in the midst of a trial already anyway." The district court requested that Judge Healey issue an order relinquishing jurisdiction formally.

On March 3, 2023, Judge Healey filed an order in which Florida expressly relinquished its jurisdiction to Minnesota. The order provided the following grounds to support its determination: (1) the child's home state is Minnesota because she had lived there with father since November 2021; (2) Minnesota is the more convenient forum because father's and the child's residence was in Minnesota; and (3) judicial economy directs that Minnesota have jurisdiction because of the ongoing trial in this matter.

On March 13, 2023, the district court filed its order terminating mother's and father's parental rights to the child pursuant to a voluntary petition under Minn. Stat. § 260C.301, subd. 1(a) (2022) because it had determined that the county orally amended the petition to reflect that the TPR was voluntary. The district court found that mother and father, for good cause, voluntarily terminated their parental rights and provided written consent for the termination. The district court found that clear and convincing evidence supported the petitions because the record demonstrates that neither parent can provide a safe, sober, and stable home for the child now or in the foreseeable future and the benefits to the child of termination outweigh the interest of preserving the parent-child relationship.

Father appeals.

## DECISION

**I.    The district court did not err by determining that it had subject matter jurisdiction to terminate father's parental rights to the child.**

Father argues that the district court did not have subject matter jurisdiction over this matter because (1) a Florida court made an initial custody determination and the Minnesota district court did not satisfy the requirements to modify the determination until after the conference on February 28, 2023, and (2) the district court did not follow proper procedures to allow it to exercise subject matter jurisdiction.

Whether a district court has subject matter jurisdiction is a question of law that we review de novo. *In re Welfare of Child. of D.M.T.-R.*, 802 N.W.2d 759, 762 (Minn. App. 2011). "Subject matter jurisdiction cannot be conferred by consent of the parties, it cannot be waived, and it can be raised at any time in the proceeding." *Tischer v. Hous. & Redev.*

11

*Auth.*, 693 N.W.2d 426, 430 (Minn. 2005). "As a general matter, Minnesota district courts have original and exclusive subject-matter jurisdiction in CHIPS and TPR proceedings involving children who are present in the state, regardless of the child's legal residency." *D.M.T.-R.*, 802 N.W.2d at 762.

Both Minnesota and Florida have adopted the Uniform Child Custody Jurisdiction and Enforcement Act. *See* Minn. Stat. §§ 518D.101-.317 (2022) (MUCCJEA); Fla. Stat. §§ 61.501-.542 (2023). The parties do not dispute that Florida had initial jurisdiction over the matter because a Florida court issued an order determining paternity and custody of the child on March 31, 2021. However, the MUCCJEA provides that a Minnesota court can modify that initial jurisdiction:

> Except as otherwise provided in section 518D.204, a court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under section 518D.201, paragraph (a), clause (1) or (2), and:
> (1) the court of the other state determines it no longer has exclusive, continuing jurisdiction under section 518D.202 or that a court of this state would be a more convenient forum under section 518D.207; or
> (2) a court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

Minn. Stat. § 518D.203. The statute sets forth a two-step analysis. We analyze each step in turn.

12

*Step 1: Section 518D.201(a)(1) or (2)*

We first analyze whether the Minnesota district court had jurisdiction to make an initial custody determination pursuant to section 518D.201(a), clause (1) or (2). Those clauses provide that a court has jurisdiction to make an initial custody determination if

> (1) this state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state; [or]
> (2) a court of another state does not have jurisdiction under clause (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section 518D.207 or 518D.208, and:
> > (i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
> > (ii) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships[.]

Minn. Stat. § 518D.201(a)(1)-(2). The Florida court declined to exercise jurisdiction here because it determined that Minnesota is the more appropriate forum, the record demonstrates that the parties have a significant connection to Minnesota, and there is substantial evidence in Minnesota relevant to this matter.

First, the Florida court declined to exercise jurisdiction in its March 3, 2023 order specifically because it determined that Minnesota was "the more appropriate forum," reasoning that the child lives in Minnesota, she left Florida with her father in November 2021, and the Florida court had not dealt with these parties outside of the March 2021 order. *See* Minn. Stat. § 518D.201(a)(2). Second, a "significant connection with this state"

13

existed because the record demonstrates that father moved to Minnesota in October 2021, father remained in Minnesota until he fled in August or September 2022, and the child remained physically in Minnesota from November 2021 until the county placed the child with her grandparents in Montana in November 2022. Additionally, the child was enrolled in school and received medical and mental-health care in Minnesota, and father rented housing, worked, and had a girlfriend in Minnesota. *See* Minn. Stat. § 518D.201(a)(2)(i). Third, the records associated with the child's time in Minnesota provide "substantial evidence" regarding the child's "care, protection, training, and personal relationships." *See* Minn. Stat. § 518D.201(a)(2)(ii). Because all three requirements in clause (2) were met, we conclude that Minnesota had jurisdiction to make an initial custody determination pursuant to Minn. Stat. § 518D.201(a)(2).

*Step 2: Section 518D.203(1) or (2)*

We next determine whether clause (1) or (2) of Minn. Stat. § 518D.203 is met. Those clauses provide that a court in Minnesota that has satisfied the requirements in Minn. Stat. § 518D.201(a)(2) may modify a child-custody determination made by another state if "the court of the other state determines . . . a court of this state would be a more convenient forum under section 518D.207." Minn. Stat. § 518D.203(1). In its March 3, 2023 order, the Florida court relinquished its jurisdiction upon determining that Minnesota would be the more convenient forum. Because the requirements of Minn. Stat. § 518D.203 are satisfied, we conclude that the Minnesota district court could properly modify jurisdiction under the MUCCJEA.

In addition to his statutory argument, father raises general concerns about how and when the district court resolved the issue of jurisdiction, but two nonprecedential decisions persuade us that the district court did not err.[4]  In *Paisley v. Kratzer*, a mother moved to Minnesota and petitioned for sole legal and sole physical custody and a new parenting-time schedule, which would modify a previous order from Montana, and the father objected because Montana still had jurisdiction.  No. A15-1115, 2016 WL 1396903, at *1 (Minn. App. Apr. 11, 2016).  At the hearing, the district court stated that it had spoken with a Montana court and the Montana court had agreed that Minnesota is "appropriate and would be the more convenient forum given the facts of the case."  *Id.*  We relied on that statement and affirmed the Minnesota district court's order modifying jurisdiction under the MUCCJEA.  *Id.* at *3.  The district court here not only spoke with the district court in the other state—it held a conference on the record in which the parties participated—and the Florida court heard and considered the evidence and arguments about which state had jurisdiction.  The result was an order from the Florida court in which it relinquished jurisdiction to the Minnesota district court.  *Paisley's* analysis is persuasive and consistent with our analysis here, and we conclude that the district court did not err.

In *Gilliard v. Leatherman*, we affirmed the district court's decision to deny a motion to dismiss for lack of subject matter jurisdiction.  No. A16-0132, 2016 WL 5640767, at *2

---

[4] Without deciding the proper procedure a district court must follow in determining subject matter jurisdiction for a voluntary TPR petition, we observe that the district court managed the circumstances of this case as best it could considering the large number of participants present at the hearing on February 27.  We also note that the district court complied with the requirements of the MUCCJEA by consulting with the Florida district court.

15

(Minn. App. Oct. 3, 2016).  In that case, the parties did not raise the issue of subject matter jurisdiction until the evidentiary hearing, at which time the district court paused proceedings to consider the issue because there was a custody case regarding the children pending in Washington.  *Id.* at *3.  Similarly to the facts here, that case involved the consideration of subject matter jurisdiction in the midst of an evidentiary hearing and the final determination of subject matter jurisdiction in the order deciding the case rather than in a separate order.  *Id.*  We are persuaded by the analysis in *Gilliard* and conclude that the issue of subject matter jurisdiction does not require a separate proceeding or order.  We further conclude that neither of the district court's decisions—to pause the proceedings to address subject matter jurisdiction and to determine jurisdiction in the final order and judgment—created an issue that we must remedy on appeal.

Finally, father argues that he was prejudiced because his Florida counsel could not attend the conference on February 28; however, the district court explained that father had not provided notice that he had obtained outside counsel and, moreover, father's attorney assigned to this matter represented him at the conference.  The statute father cites as support requires only that father be allowed "to present facts and legal arguments before a decision on jurisdiction is made."  Minn. Stat. § 518D.110(b).  Father's Minnesota attorney was present at the conference and objected to the determination that Minnesota was the proper forum.  The absence of father's Florida counsel from the conference did not violate Minnesota statutes or prejudice father because the district court heard and considered

16

father's arguments from his counsel of record prior to deciding jurisdiction.[5] We discern no error in how the district court managed the issue of jurisdiction.

In sum, the district court had subject matter jurisdiction over these proceedings because all the statutory requirements for modification pursuant to the MUCCJEA were met.

## II. Father's motion to modify the issues on appeal is denied.

Father appealed the district court's judgment on March 30, 2023, then he filed a notice of voluntary dismissal, and we dismissed the appeal on April 14, 2023. At the end of 2023, father moved to reinstate the appeal, and we granted his motion in January 2024. In the order reinstating the appeal, we stated that "the scope of this appeal will be limited to the issue of the district court's subject matter jurisdiction." Father moved for permission to amend the scope of the appeal, and the motion was referred to this panel for decision.

Father was self-represented in his motion, and in his affidavit accompanying the motion, he identified 14 additional issues that he would like this court to address. Father provided little to no specificity or legal authority supporting those additional legal issues that would allow this court to meaningfully analyze his arguments. "[O]n appeal error is never presumed. It must be made to appear affirmatively before there can be reversal . . . [and] the burden of showing error rests upon the one who relies upon it." *Loth v. Loth*, 35 N.W.2d 542, 546 (Minn. 1949) (quotation omitted). Inadequately briefed issues are forfeited and not properly before an appellate court. *Melina v. Chaplin*, 327 N.W.2d

---

[5] The Florida court also heard and considered father's arguments on subject matter jurisdiction.

19, 20 (Minn. 1982). Because his arguments are not appropriately raised or supported, we decline to consider father's pro se arguments here.

In his formal brief to this court, filed and written by his appellate counsel, father raised claims beyond subject matter jurisdiction; specifically, he also argued that the district court erred by (1) determining that the initial involuntary petition for TPR was converted to a voluntary petition by way of oral modification during the hearing on February 27, 2023, (2) failing to terminate his rights under the proper legal standard, and (3) failing to make findings that the county made reasonable efforts to reunite him and the child.

Our review is limited to questions and issues already heard and decided by the district court. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that appellate courts generally address only those questions previously presented to and considered by the district court). Minnesota Rules of Juvenile Protection Procedure 21.03 and 22.02 direct a party seeking relief from a final order to move the district court for relief via amended findings, a new trial, or "such other relief as may be just." When no posttrial motion is made, the scope of our review is limited to "whether the evidence sustains the findings of fact[,] whether such findings sustain the conclusions of law and the judgment," and "substantive legal questions . . . properly raised during trial." *In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 733 (Minn. 2009) (quotation omitted). A posttrial motion "gives the [district] court time to consider the context of the objection and the effect the error may have had on the outcome of the case." *Alpha Real Est. Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 310 (Minn. 2003). "This permits the court to more

18

fully develop the record for appellate review or to correct its own mistake and alleviate the need for appellate review." *Id.*

Here, father did not file any posttrial motions, and therefore, the district court did not have an opportunity to review and correct any errors or to develop the record more fully in response to any of father's new assertions. Because he did not raise these arguments to the district court, father forfeited them. *See In re Welfare of C.L.L.*, 310 N.W.2d 555, 557 (Minn. 1981) (declining, in a TPR appeal, to address a constitutional argument made for the first time on appeal). Therefore, father's motion to amend the scope of the appeal is denied.

**Affirmed; motion denied.**